**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NOKIA CORPORATION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>APPLE INC.,<br><br>　　　　Defendant.<br>─────────────────────────<br>APPLE INC.,<br><br>　　　　Counterclaim-Plaintiff,<br><br>　　v.<br><br>NOKIA CORPORATION and NOKIA INC.,<br><br>　　　　Counterclaim-Defendants. | C.A. 09-791-GMS<br><br>**JURY TRIAL DEMANDED** |

## APPLE INC.'S ANSWER, DEFENSES, AND COUNTERCLAIMS

### INTRODUCTORY STATEMENT

1.　　This is Apple Inc.'s ("Apple") responsive pleading under Fed. R. Civ. P. 12, and contains Apple's defenses and Apple's counterclaims pursuant to Fed. R. Civ. P. 13.

2.　　Apple responds to the allegations contained in the numbered paragraphs of Nokia's Complaint below, but first provides this brief overview of its response.  With respect to Nokia's claims of infringement (a) Apple denies that it infringes any valid claim of the patents identified in Counts I – X of Nokia's Complaint ("Nokia Asserted Patents"), (b) Apple denies that the Nokia Asserted Patents are essential to any standard, but to the extent that they are construed by the Court as essential, Apple asserts that Nokia is obligated by commitments it

made to Standards Setting Organizations ("SSOs"), but has refused, to license those patents on Fair, Reasonable, and Non-Discriminatory ("F/RAND") terms, and (c) to the extent the Nokia Asserted Patents are construed by the Court to be essential to any standard, Apple asserts that it has the irrevocable right to be licensed under those patents on F/RAND terms.

3.      In dealing with Apple, Nokia has sought to gain an unjust competitive advantage over Apple by charging unwarranted fees to use patents that allegedly cover industry compatibility standards and by seeking to obtain access to Apple's intellectual property.  Nokia needs access to Apple's intellectual property because Nokia has copied and is now using that patented technology.  Nokia's improper claims against Apple therefore should be rejected, and Apple seeks recovery for Nokia's infringement of the Apple patents identified in Counts XXVII – XXXIX of Apple's counterclaim.[1]

4.      When mobile wireless handsets or cell phones were first introduced, the technology focused on the ability to make and receive traditional voice calls.  Nokia was an early participant in the development and sale of these traditional voice call-focused mobile phones.  Over time, however, mobile phone technology converged with computer technology and other technology advances, including many advances pioneered by Apple.  The result of this convergence of technology is that today's mobile phones have not only traditional voice capabilities, but also an enormously wide range of capabilities that historically have been found only in personal computers.  For example, today's "smartphones" can send and receive emails,

---

[1]   In addition, Nokia is exploiting various other technologies developed by Apple that are the subject of issued patents not asserted herein as well as currently pending patent applications filed by Apple.  By way of example, the U.S. Patent Office recently allowed Apple's patent application No. 11/322,549, entitled Unlocking a Device By Performing Gestures On An Unlock Image, which Nokia is using.

surf the Internet, play videos and music, take and send pictures, and run software applications.
Today's "smartphones" are sophisticated, portable computing devices with immense capabilities.

5.     Long a leader in computer technology, Apple foresaw the importance of
converged user-friendly mobile devices.  Capitalizing upon its unique operating system,
hardware, application software, services, and know-how, Apple provides its customers new
products and solutions with superior ease-of-use, seamless integration, and innovative industrial
design.  Apple has designed a business strategy based on the convergence of personal computers,
mobile communications, and digital consumer electronics, and produced cutting-edge,
technologically superior, and user-friendly devices such as the iPod, iPod Touch, and the iPhone.

6.     In 2007, Apple introduced the iPhone, a ground-breaking device that allowed
users access to the functionality of the already popular iPod on a revolutionary mobile phone and
Internet device.  The iPhone is a converged device that allows users to access an ever expanding
set of software features to take and send pictures, play music, play games, do research, serve as a
GPS device, and much more.  The convergence of technologies and popularity of the iPhone and
its "apps" are evident by the overwhelming success of Apple's App Store, which now offers
more than 100,000 "apps" in twenty different categories, including games, business, news,
sports, health, and travel.  The iPhone platform has caused a revolutionary change in the mobile
phone category.

7.     In contrast, Nokia made a different business decision and remained focused on
traditional mobile wireless handsets with conventional user interfaces.  As a result, Nokia has
rapidly lost share in the market for high–end mobile phones.  Nokia has admitted that, as a result
of the iPhone launch, "the market changed suddenly and [Nokia was] not fast enough changing

with it." (Abhinav Ramnarayan, "Nokia Fights Back for Share of Smartphone Market," The Guardian (London), Sept. 3, 2009, at 24.)

8.      In response, Nokia chose to copy the iPhone, especially its enormously popular and patented design and user interface. As Anssi Vanjoki, Nokia's Executive Vice President and General Manager of Multimedia, stated at Nokia's GoPlay event in 2007 when asked about the similarities of Nokia's new offerings to the already released iPhone: "If there is something good in the world, we copy with pride."

9.      Through the present suit, Nokia has asserted unfounded claims of infringement and breached licensing commitments it made to license on F/RAND terms all patents that it claimed were necessary for a party to practice standards. Nokia has also violated those licensing commitments by demanding unjustifiable royalties and reciprocal licenses to Apple's patents covering Apple's pioneering technology – patents unrelated to any industry standard. This attempt by Nokia to leverage patents previously pledged to industry standards is an effort to free ride on the commercial success of Apple's innovative iPhone while avoiding liability for copying the iPhone and infringing Apple's patents.

## ANSWER

Apple hereby responds to each numbered paragraph of the Complaint as follows:

## INTRODUCTION[2]

1.      Paragraph 1 contains no allegation to which a response is required.

2.      Apple denies the allegations in Paragraph 2.

---

[2]   For convenience and clarity, Apple's Answer utilizes the same headings as set forth in Nokia's Complaint. In so doing, Apple does not admit any of the allegations contained in Nokia's headings.

3.      Apple admits that Nokia has declared one or more of the patents-in-suit essential to one or more of the GSM, UMTS, and/or 802.11 Standards and has promised to grant licenses under each patent on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions (in some cases, alternatively referred to as "reasonable and nondiscriminatory," or "RAND") (collectively "F/RAND").  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 3.

4.      Apple admits that it has the right to be granted license(s) to Nokia's declared essential patents under F/RAND terms and conditions.  Apple lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 4.

5.      Apple denies the allegations in Paragraph 5.

6.      Apple denies the allegations in Paragraph 6.

7.      Paragraph 7 contains no allegation to which a response is required but, to the extent any response is required, Apple denies the allegations in Paragraph 7.

## PARTIES

8.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8.

9.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9.

10.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10.

11.      Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11.

12.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12.

13.     Apple lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13.

14.     Apple admits the allegations of Paragraph 14.

15.     Apple admits that it sold its first mobile telephone device in 2007.  Apple denies the remaining allegations of Paragraph 15.

## JURISDICTION AND VENUE

16.     Apple admits that this Court has subject matter jurisdiction over Nokia's claims.

17.     Apple admits that this Court may exercise personal jurisdiction over Apple.

18.     Apple admits that its products are used, offered for sale, sold, and have been purchased in Delaware.  Apple admits that venue is proper in this District.

## FACTUAL BACKGROUND

### The Mobile Wireless Industry

19.     Apple admits the allegations of Paragraph 19.

20.     Apple admits the allegations of Paragraph 20.

21.     Apple admits the allegations of Paragraph 21.

22.     Apple admits the allegations of Paragraph 22.

### The Importance of Standards

23.     Apple admits that it is a member of the European Telecommunications Standards Institute ("ETSI").  On information and belief, Apple admits that Nokia is also a member of ETSI.  Apple admits that ETSI is a non-profit institution founded in 1988, and that the UMTS and GSM standards were developed under the aegis of ETSI.  Apple lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph
23.

24.     Apple admits the allegations of Paragraph 24.

25.     Apple lacks knowledge or information sufficient to form a belief as to whether
Nokia is engaged in research and development of new telecommunications technologies or
whether Nokia owns intellectual property rights relating to different elements of such
technologies.  Apple admits that ETSI members are engaged in research and development of
telecommunications technology and own intellectual property rights relating to different
elements of such technologies.  Apple admits that ETSI members take such intellectual property
rights into account when developing specifications for standards, and that ETSI has adopted an
Intellectual Property Policy ("the ETSI IPR Policy") to govern the manner in which ETSI will
take account of such intellectual property rights in the process leading to the adoption of ETSI
standards.  Apple denies the remaining allegations of Paragraph 25.

26.     Apple admits that the ETSI IPR policy was adopted in 1994, that it has been part
of the "ETSI Directives" since at least December 2004, and that its provisions are explained in
the ETSI Guide on Intellectual Property Rights.  Apple denies the remaining allegations of
Paragraph 26.

27.     Apple admits that Nokia has correctly quoted Clause 3.1 of the ETSI IPR Policy,
which speaks for itself.

28.     Apple denies that ETSI permits its members to decline to refuse the granting of
licenses and admits the remaining allegations of Paragraph 28.

29.     Apple admits that Nokia has correctly quoted a portion of Clause 6.1 of the ETSI
IPR Policy, which speaks for itself.

30.     Apple admits that Clause 8 of the ETSI IPR Policy sets forth ETSI's procedures for addressing the inability to obtain a FRAND undertaking from a potential essential patent holder. Clause 8 speaks for itself. Clauses 4 and 6 of the ETSI IPR Policy set forth ETSI's policies on such disclosures and undertakings, and they speak for themselves.

31.     Apple admits that Nokia has submitted FRAND undertakings for certain of the patents-in-suit, including U.S. Patent No. 5,802,465 (the "'465 Patent"). Apple lacks sufficient knowledge or information as to the specific language of the '465 Patent undertaking to form a belief as to the truth of the remaining allegations of Paragraph 31.

32.     Apple admits the allegations of Paragraph 32.

33.     Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is engaged in research and development of new technologies or whether Nokia owns intellectual property rights relating to different elements of such technologies. Apple admits that IEEE-SA members are engaged in the research and development of new technologies and own intellectual property rights relating to different elements of such technologies. Apple admits that the IEEE-SA Standards Board Bylaws ("IEEE-SA Bylaws") contain an IPR (*i.e.*, intellectual property rights) policy, which speaks for itself. Apple denies the remaining allegations of Paragraph 33.

34.     Apple admits that Clause 6.2 of the IEEE-SA Bylaws includes provisions governing when letters of assurances will be requested and the content of such letters. Apple further admits that Nokia has correctly quoted a portion of Clause 6.2, which speaks for itself.

35.     Apple admits that Nokia has correctly quoted a portion of Clause 6.2 of the IEEE-SA Bylaws, which speaks for itself.

36.    Apple admits that, pursuant to Clause 6.2 of the IEEE-SA Bylaws, a letter of assurance "is irrevocable once submitted and accepted and shall apply, at a minimum, from the date of the standard's approval to the date of the standard's withdrawal."

37.    Apple admits that Nokia has submitted letters of assurance for certain patents-in-suit, including the '465 Patent, and that Nokia has properly quoted portions of that letter, which speaks for itself. Apple lacks knowledge or information sufficient to form a belief as to whether those declarations fully complied with IEEE-SA Bylaws.

**F/RAND**

38.    Apple admits the allegations of Paragraph 38.

39.    Apple admits that an IPR holder that commits to license patents on F/RAND terms and conditions has irrevocably committed to allow the standard to be implemented under its IPR on a F/RAND basis and thereby waived the right to exclude others from practicing the standard under its IPR. Apple also admits that an IPR holder that commits to license patents on F/RAND terms and conditions cannot use its hold-up power resulting from the incorporation of its technology into the standard to extort royalties that do not comply with F/RAND. Apple denies the remaining allegations of Paragraph 39.

40.    Apple admits that once an IPR holder has made a F/RAND commitment, all designers have the right to implement the standard in their products and use the inventions from any declared essential IPRs, and that there is no need to wait until all the particular F/RAND terms and conditions have been negotiated with the IPR holder or until a definitive license agreement is executed setting out those terms. Apple also admits that Nokia has correctly quoted Clause 3.2 of the ETSI IPR Policy, which speaks for itself. Apple denies the remaining allegations of Paragraph 40.

41.     Apple admits the allegations in Paragraph 41.

42.     Apple denies the allegations of Paragraph 42.

**Apple's Refusal to Pay F/RAND Compensation**

43.     Apple admits that Nokia has irrevocably undertaken the obligation to grant license(s) on F/RAND terms and conditions to the patents it declared essential, and that Apple has the corresponding right to obtain licenses on F/RAND terms and conditions on the basis of Nokia's undertakings.  Apple denies the remaining allegations of Paragraph 43.

44.     Apple admits that Nokia provided Apple with claim charts and certain information on the method Nokia purportedly used to calculate its proposed royalty.  Apple also admits that Nokia defined both a portfolio rate and an average per patent royalty rate.  Apple denies the remaining allegations of Paragraph 44.

45.     Apple denies the allegations of Paragraph 45.

46.     Apple denies the allegations of Paragraph 46.

**OVERVIEW OF THE PATENTS-IN-SUIT**

47.     Apple admits that wireless devices today are used for a wide variety of tasks, such as sending email, browsing the Internet, and downloading applications.  Apple denies the remaining allegations of Paragraph 47.

48.     Apple denies the allegations of Paragraph 48.

49.     Apple admits that wireless devices today are used for e-commerce and other purchases.  Apple denies the remaining allegations of Paragraph 49.

**Wireless Data Patents**

50.     Apple admits that the '465 Patent is entitled "Data Transmission in a Radio Telephone Network"; that the '465 Patent indicates that it was issued by the United States Patent

and Trademark Office ("USPTO") on September 1, 1998; and that an uncertified copy of the '465 Patent is attached to the Complaint as Exhibit A. Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '465 Patent, and whether Exhibit A is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 50.

51.     Apple admits that Nokia has declared the '465 Patent essential to the GSM, UMTS, and IEEE 802.11 standards. Apple denies the remaining allegations contained in Paragraph 51.

52.     Apple admits that United States Patent No. 6,359,904 B1 ("'904 Patent") is entitled "Data Transmission in a Mobile Telephone Network"; that the '904 Patent indicates that it was issued by the USPTO on March 19, 2002; and that an uncertified copy of the '904 Patent is attached to the Complaint as Exhibit B. Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '904 Patent, and whether Exhibit B is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 52.

53.     Apple admits that Nokia has declared the '904 Patent essential to the GSM and IEEE 802.11 standards. Apple denies the remaining allegations contained in Paragraph 53.

54.     Apple admits that United States Patent No. 6,694,135 B1 ("'135 Patent") is entitled "Measurement Report Transmission in a Telecommunications System"; that the '135 Patent indicates that it was issued by the USPTO on February 17, 2004; and that an uncertified copy of the '135 Patent is attached to the Complaint as Exhibit C. Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title

and interest in the '135 Patent, and whether Exhibit C is a true and correct copy.   Apple denies the remaining allegations contained in Paragraph 54.

55.     Apple denies the allegations contained in Paragraph 55.

56.     Apple admits that United States Patent No. 6,775,548 B1 ("'548 Patent") is entitled "Access Channel for Reduced Access Delay in a Telecommunications System"; that the '548 Patent indicates that it was issued by the USPTO on August 10, 2004; and that an uncertified copy of the '548 Patent is attached to the Complaint as Exhibit D.  Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '548 Patent, and whether Exhibit D is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 56.

57.     Apple admits that Nokia has declared the '548 Patent essential to the UMTS standard. Apple denies the remaining allegations contained in Paragraph 57.

58.     Apple admits that United States Patent No. 7,092,672 B1 ("'672 Patent") is entitled "Reporting Cell Measurement Results in a Cellular Communication System"; that the '672 Patent indicates that it was issued by the USPTO on August 15, 2006; and that an uncertified copy of the '672 Patent is attached to the Complaint as Exhibit E.  Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '672 Patent, and whether Exhibit E is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 58.

59.     Apple admits that Nokia has declared the '672 Patent essential to the GSM standard. Apple denies the remaining allegations contained in Paragraph 59.

### Speech Coding Patents

60.     Apple admits that United States Patent No. 5,862,178 ("'178 Patent") is entitled "Method and Apparatus for Speech Transmission in a Mobile Communications System"; that the '178 Patent indicates that it was issued by the USPTO on January 19, 1999; and that an uncertified copy of the '178 Patent is attached to the Complaint as Exhibit F. Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '178 Patent, and whether Exhibit F is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 60.

61.     Apple admits that Nokia has declared the '178 Patent essential to the GSM standard. Apple denies the remaining allegations contained in Paragraph 61.

62.     Apple admits that United States Patent No. 5,946,651 ("'651 Patent") is entitled "Speech Synthesizer Employing Post-Processing for Enhancing the Quality of the Synthesized Speech"; that the '651 Patent indicates that it was issued by the USPTO on August 31, 1999; and that an uncertified copy of the '651 Patent is attached to the Complaint as Exhibit G. Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '651 Patent, and whether Exhibit G is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 62.

63.     Apple admits that Nokia has declared the '651 Patent essential to the GSM standard. Apple denies the remaining allegations contained in Paragraph 63.

### Security and Encryption Patents

64.     Apple admits that United States Patent No. 6,882,727 ("'727 Patent") is entitled "Method of Ciphering Data Transmission in a Radio System"; that the '727 Patent indicates that it was issued by the USPTO on April 19, 2005; and that an uncertified copy of the '727 Patent is

attached to the Complaint as Exhibit H. Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '727 Patent, and whether Exhibit H is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 64.

65.     Apple admits that Nokia has declared the '727 Patent essential to the UMTS standard. Apple denies the remaining allegations contained in Paragraph 65.

66.     Apple admits that United States Patent No. 7,009,940 ("'940 Patent") is entitled "Integrity Check in a Communication System"; that the '940 Patent indicates that it was issued by the USPTO on March 7, 2006; and that an uncertified copy of the '940 Patent is attached to the Complaint as Exhibit I. Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '940 Patent, and whether Exhibit I is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 66.

67.     Apple denies the allegations contained in Paragraph 67.

68.     Apple admits that United States Patent No. 7,403,621 ("'621 Patent") is entitled "System for Ensuring Encrypted Communication After Handover"; that the '621 Patent indicates that it was issued by the USPTO on July 22, 2008; and that an uncertified copy of the '621 Patent is attached to the Complaint as Exhibit J. Apple lacks knowledge or information sufficient to form a belief as to whether Nokia is the current owner of all rights, title and interest in the '621 Patent, and whether Exhibit J is a true and correct copy. Apple denies the remaining allegations contained in Paragraph 68.

69.     Apple admits that Nokia has declared the '621 Patent essential to the GSM and UMTS standards. Apple denies the remaining allegations contained in Paragraph 69.

### APPLE'S INFRINGEMENT

70.     Apple denies the allegations of Paragraph 70.

### HARM TO NOKIA FROM APPLE'S INFRINGEMENT

71.     Apple denies the allegations of Paragraph 71.

72.     Apple denies the allegations of Paragraph 72.

73.     Apple denies the allegations of Paragraph 73.

### COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 5,802,465

74.     Apple incorporates by reference its responses to as set forth in Paragraphs 1-73 of the Answer as if set forth fully herein.

75.     Apple denies the allegations of Paragraph 75.

76.     Apple denies the allegations of Paragraph 76.

77.     Apple denies the allegations of Paragraph 77.

78.     Apple denies the allegations of Paragraph 78.

79.     Apple denies the allegations of Paragraph 79.

### COUNT II

### INFRINGEMENT OF U.S. PATENT NO. 5,862,178

80.     Apple incorporates by reference its responses to as set forth in Paragraphs 1-79 of the Answer as if set forth fully herein.

81.     Apple denies the allegations of Paragraph 81.

82.     Apple denies the allegations of Paragraph 82.

83.     Apple denies the allegations of Paragraph 83.

84.     Apple denies the allegations of Paragraph 84.

85.    Apple denies the allegations of Paragraph 85.

## COUNT III

## INFRINGEMENT OF U.S. PATENT NO. 5,946,651

86.    Apple incorporates by reference its responses to as set forth in Paragraphs 1-85 of the Answer as if set forth fully herein.

87.    Apple denies the allegations of Paragraph 87.

88.    Apple denies the allegations of Paragraph 88.

89.    Apple denies the allegations of Paragraph 89.

90.    Apple denies the allegations of Paragraph 90.

91.    Apple denies the allegations of Paragraph 91.

## COUNT IV

## INFRINGEMENT OF U.S. PATENT NO. 6,359,904

92.    Apple incorporates by reference its responses to as set forth in Paragraphs 1-91 of the Answer as if set forth fully herein.

93.    Apple denies the allegations of Paragraph 93.

94.    Apple denies the allegations of Paragraph 94.

95.    Apple denies the allegations of Paragraph 95.

96.    Apple denies the allegations of Paragraph 96.

97.    Apple denies the allegations of Paragraph 97.

## COUNT V

## INFRINGEMENT OF U.S. PATENT NO. 6,694,135

98.    Apple incorporates by reference its responses to as set forth in Paragraphs 1-97 of the Answer as if set forth fully herein.

99.      Apple denies the allegations of Paragraph 99.

100.     Apple denies the allegations of Paragraph 100.

101.     Apple denies the allegations of Paragraph 101.

102.     Apple denies the allegations of Paragraph 102.

103.     Apple denies the allegations of Paragraph 103.

**COUNT VI**

**INFRINGEMENT OF U.S. PATENT NO. 6,775,548**

104.     Apple incorporates by reference its responses to as set forth in Paragraphs 1-103 of the Answer as if set forth fully herein.

105.     Apple denies the allegations of Paragraph 105.

106.     Apple denies the allegations of Paragraph 106.

107.     Apple denies the allegations of Paragraph 107.

108.     Apple denies the allegations of Paragraph 108.

109.     Apple denies the allegations of Paragraph 109.

**COUNT VII**

**INFRINGEMENT OF U.S. PATENT NO. 6,882,727**

110.     Apple incorporates by reference its responses to as set forth in Paragraphs 1-109 of the Answer as if set forth fully herein.

111.     Apple denies the allegations of Paragraph 111.

112.     Apple denies the allegations of Paragraph 112.

113.     Apple denies the allegations of Paragraph 113.

114.     Apple denies the allegations of Paragraph 114.

115.     Apple denies the allegations of Paragraph 115.

## COUNT VIII

### INFRINGEMENT OF U.S. PATENT NO. 7,009,940

116.   Apple incorporates by reference its responses to as set forth in Paragraphs 1-115 of the Answer as if set forth fully herein.

117.   Apple denies the allegations of Paragraph 117.

118.   Apple denies the allegations of Paragraph 118.

119.   Apple denies the allegations of Paragraph 119.

120.   Apple denies the allegations of Paragraph 120.

121.   Apple denies the allegations of Paragraph 121.

## COUNT IX

### INFRINGEMENT OF U.S. PATENT NO. 7,092,672

122.   Apple incorporates by reference its responses to as set forth in Paragraphs 1-121 of the Answer as if set forth fully herein.

123.   Apple denies the allegations of Paragraph 123.

124.   Apple denies the allegations of Paragraph 124.

125.   Apple denies the allegations of Paragraph 125.

126.   Apple denies the allegations of Paragraph 126.

127.   Apple denies the allegations of Paragraph 127.

## COUNT X

### INFRINGEMENT OF U.S. PATENT NO. 7,403,621

128.   Apple incorporates by reference its responses to as set forth in Paragraphs 1-127 of the Answer as if set forth fully herein.

129.   Apple denies the allegations of Paragraph 129.

130.    Apple denies the allegations of Paragraph 130.

131.    Apple denies the allegations of Paragraph 131.

132.    Apple denies the allegations of Paragraph 132.

133.    Apple denies the allegations of Paragraph 133.

## COUNT XI

## DECLARATORY JUDGMENT REGARDING F/RAND RIGHTS

134.    Apple incorporates by reference its responses to as set forth in Paragraphs 1-133 of the Answer as if set forth fully herein.

135.    Apple denies the allegations of Paragraph 135.

136.    Apple denies the allegations of Paragraph 136.

137.    Apple denies the allegations of Paragraph 137.

138.    Apple denies the allegations of Paragraph 138

139.    Apple denies the allegations of Paragraph 139.

140.    Paragraph 140 contains no allegations to which a response is required but, to the extent one is required, Apple denies the allegations of Paragraph 140.

141.    Apple denies the allegations of Paragraph 141.

## DEMAND FOR JURY TRIAL

142.    Paragraph 142 contains no allegations as to which a response is required.

## APPLE'S DEFENSES TO NOKIA'S COMPLAINT

On information and belief, Apple asserts the following defenses to Apple's Complaint:

## First Defense (Non-Infringement)

Nokia is not entitled to any relief against Apple because Apple has not directly or indirectly infringed any valid claim of the '465 Patent, '178 Patent, '651 Patent, '904 Patent, '135 Patent, '548 Patent, '727 Patent, '940 Patent, '672 Patent, and '621 Patent.

## Second Defense (Invalidity)

One or more of the claims of the Nokia Asserted Patents are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and 112.

## Third Defense (Unenforceability)

One or more of the Nokia Asserted Patents are unenforceable against Apple because of estoppel, laches, waiver, unclean hands, and/or other applicable equitable doctrines.

## Fourth Defense (Limitation of Damages)

Nokia's right to seek damages is limited, including without limitation by 35 U.S.C. §§ 286 and 287.

## Fifth Defense (License)

Apple denies that Nokia's Asserted Patents are essential to any standard, but to the extent that they are and to the extent any of the alleged inventions described in and allegedly covered by the Nokia Asserted Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple is licensed under the Nokia Asserted Patents pursuant to an actual or implied license.

### Sixth Defense (Patent Misuse)

Nokia's false representations to SSOs that it would license the patents it declared

essential on F/RAND terms, and Nokia's assertion of its wrongly obtained monopoly power

against Apple in demanding non-F/RAND license terms, constitute patent misuse and render

them unenforceable.  In addition, Nokia's demand for a reciprocal "grantback" license to

Apple's non-standard essential patents as a condition for licensing Nokia's purported essential

patents at a F/RAND royalty rate constitutes misuse of Nokia's purported essential patents.

### COUNTERCLAIMS

Plaintiff-in-counterclaim Apple, on personal knowledge as to its own acts, and on

information and belief as to all others based on its own and its attorneys' investigation, alleges

Counterclaims against Nokia Corporation and Nokia, Inc. (collectively, "Nokia") as follows:

### NATURE OF THE ACTION

1.　 These Counterclaims arise from Nokia's baseless allegations of infringement;

Nokia's false F/RAND commitments that it made to SSOs and to designers and sellers of

products implementing those standards; Nokia's breach of those commitments by demanding

that Apple pay non-F/RAND terms for Nokia's claimed standards-essential patents; and Nokia's

infringement of Apple's patents.

2.　 Upon information and belief, Nokia claims to be the owner of all rights, titles, and

interests in and to the '465 Patent, '178 Patent, '651 Patent, '904 Patent, '135 Patent, '548

Patent, '727 Patent, '940 Patent, '672 Patent, and '621 Patent (collectively, the "Nokia Asserted

Patents").

3.      An actual case or controversy exists between the parties concerning the infringement, validity, and enforceability of one or more of the claims of the Nokia Asserted Patents.

4.      Nokia has accused Apple of infringement of the Nokia Asserted Patents.

5.      In its Complaint, Nokia acknowledges, as it must, that F/RAND commitments are critical to successful standard setting to prevent "hold-up" by claimed standards-essential patent holders; that F/RAND commitments are binding and irrevocable; and that Apple has specific contractual rights, as a member of SSOs, a designer of products implementing those standards, and a beneficiary of Nokia's F/RAND commitments, to license on F/RAND terms Nokia's purported standards-essential and F/RAND-committed patents – including the patents that Nokia has asserted in this case, to the extent they are essential to any standard, which Apple denies. Nokia admits in its Complaint that, once it made its F/RAND commitment, all designers, including Apple, have the right to implement any technologies covered by those patents.

6.      Before its license negotiations with Apple, Nokia also acknowledged that F/RAND royalties must be modest and limited in order to facilitate broad use of standardized technology—as a *quid pro quo* for the benefits (*e.g.*, high-volume industry usage of patented technology) that standardization provides holders of essential patents.

7.      In its negotiations with Apple, Nokia departed from these well-established F/RAND requirements, and its own prior acknowledgments of the meaning of F/RAND, and demanded unfair, unreasonable, and discriminatory licensing terms from Apple.  In particular, Nokia insisted on both exorbitant royalties and "grantbacks" of licenses to Apple's patented technology *not related to any standard* – such as, patented technology that would cover proprietary features of Apple's extraordinarily successful iPhone product line.  Nokia's demands

appear to have been driven by declines in its own mobile phone business. In short, Nokia has been attempting to use its allegedly standards-essential patents to help regain what Nokia has lost in the marketplace.

8.      Apple brings these Counterclaims to remedy Nokia's violation of its F/RAND commitments. Nokia has abused standard-setting processes that are crucial to bringing pro-competitive benefits to innovators, telecommunications equipment and network suppliers, and end consumers alike. Nokia has abused the monopoly positions that the standards conferred on its claimed standards-essential technologies and breached its contractual commitments by demanding exorbitant royalties and other unreasonable licensing terms. Apple seeks to bring this misconduct to an end and thereby prevent further harm to Apple, the mobile wireless communications industry, and consumers.

9.      In addition, Nokia has copied and infringed Apple's innovative technologies. As Anssi Vanjoki, Nokia's Executive Vice President and General Manager of Multimedia, stated at Nokia's GoPlay event in 2007 when asked about the similarities of Nokia's new offerings to the already released iPhone: "[i]f there is something good in the world, we copy with pride." True to this quote, Nokia has demonstrated its willingness to copy Apple's iPhone ideas as well as Apple's basic computing technologies, all the while demanding that Apple pay for access to Nokia's purported standards essential patent. Apple seeks redress for this behavior.

## PARTIES

10.      Apple is a corporation organized under the laws of the State of California and its principal place of business is in Cupertino, California.

11.      Apple designs and markets a broad range of innovative products including personal computers (*e.g.*, MacBook®s, Mac® Pro, iMac®s), portable digital music players

(iPods), and mobile communications devices (iPhones, described in more detail in Paragraphs 19-20, *infra*). Apple also sells a variety of other products and services, including software, peripherals (printers, displays, computer memory, etc.), and networking solutions.  In addition, Apple sells a variety of digital content, including music and video, through its on-line iTunes® ("iTunes") Store.

12.     According to Nokia's Complaint, Nokia Corporation is incorporated under the laws of Finland and has its principal place of business in Finland.  Nokia, Inc., Nokia Corporation's wholly owned United States subsidiary, is incorporated in Delaware, with a principal place of business in Texas.

13.     Nokia owns many patents that it claims have been incorporated into various standards for wireless technologies ("purported essential patents").  Nokia sells, among other products, "smartphones" (phones with email, Internet, messaging, and other advanced features) that compete with Apple's iPhone.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this counterclaim pursuant to the Federal Patent Act, 28 U.S.C. §§ 1338(a), 2201, 2202, and 28 U.S.C. §§ 1331, 1337.

15.     This Court has diversity jurisdiction over the state law claims asserted in the counterclaim under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the case is between Nokia Corporation, a citizen of a foreign state, and Apple, a citizen of California, and the case between Nokia, Inc. and Apple is a case between a citizen of California (Apple) and a company incorporated in Delaware with a principal place of business in Texas (Nokia, Inc.).

16.     The Court also has supplemental jurisdiction over the state law claims asserted in this counterclaim under 28 U.S.C. § 1367 because the state and federal claims arise from a common nucleus of operative facts.

17.     Nokia Corporation has subjected itself to personal jurisdiction by suing Apple in this District, and, in any event, Nokia, Inc. and Nokia Corporation are subject to personal jurisdiction because they place wireless communication devices in the stream of commerce knowing that such products will be sold in the State of Delaware.

18.     Venue is proper in this District under 28 U.S.C. § 1391 and § 1400(b).

## BACKGROUND

### 1. Competition Between Apple and Nokia

19.     Apple's iPhone combines in a single handheld product a mobile phone, a widescreen iPod with touch controls, and an Internet communication platform.  Apple released the original iPhone in June 2007.  In June 2008, Apple launched iPhone3G, the second-generation iPhone, together with iPhone 2.0 software.  It combined the original features of iPhone with high-speed networking, a built-in global positioning system ("GPS"), a 2-megapixel camera, and a 3.5-inch touch widescreen.  In June 2009, Apple launched the iPhone3G[S], which offers improved performance (including longer battery life and faster web browsing), a 3-megapixel, autofocus camera, and hands free voice control.  iPhone users have access to Apple's iTunes App Store, which offers software applications for the iPhone.  Over 100,000 applications are available to iPhone users.

20.     The iPhone has become broadly available throughout the United States, Canada, Europe, and Asia, and has become a leading smartphone.

21.     Nokia has long been a supplier of wireless handsets and other wireless equipment, including mobile telephones. Nokia enjoyed early success as a supplier of handsets designed primarily for voice communications, but now also supplies smartphone devices, including the ESeries, the NSeries, and the 5000 Series, that include email access, web-browsing features, and the ability to download and play music and video. Nokia recently has introduced several high-end smartphone devices in an attempt to better compete with the iPhone.

22.     Nokia has suffered declines in share for its high-end smartphone sales in the United States and worldwide. Recently, Nokia's executive vice president for mobile phones admitted the company was slow to react to the emergence of high-end smartphones, like the iPhone. He candidly conceded that "the market changed suddenly and [Nokia was] not fast enough changing with it." (Abhinav Ramnarayan, "Nokia Fights Back for Share of Smartphone Market," The Guardian (London), Sept. 3, 2009, at 24.)

23.     By the fourth quarter of 2008, Nokia's worldwide share had dropped to 40.8%, down from 50.9% in the fourth quarter of 2007. Industry reports recognized that Nokia's portfolio was heavily skewed toward low-end devices, and Nokia was exposed to competitive pressure in the higher end of the consumer smartphone segment.

24.     Most recently, in June 2009, Nokia launched the N97, its "flagship mobile computer." Nokia's N97 offers a full QWERTY keyboard, Internet, music, video, maps and navigation, as well as a built-in camera. The launch only exacerbated Nokia's struggles. One industry report noted that the N97 launch "met little enthusiasm." Nokia reportedly sold just 500,000 units through August 2009.

25.     In the third quarter of 2009, Nokia's share of worldwide smartphone sales reached an "all time low," according to one industry report, down to 39.3%. Nokia's declining

smartphone sales, combined with a $1.4 billion writedown for one of its struggling business units, led to a significant decline in the company's stock value.

26.     Having suffered losses in the marketplace, Nokia has resorted to demanding exorbitant royalties from Apple for patents that Nokia claims are essential to various compatibility standards for mobile wireless telecommunications and wireless computing that Apple practices.  Nokia also has improperly demanded, as a condition to licensing its patents to Apple for a F/RAND royalty, that Apple grant it reciprocal licenses ("grantbacks") to various patented technologies *not essential to any standard*.  Nokia's demands for unreasonable royalties and grantbacks violate the promises Nokia made to the SSOs that developed and adopted these standards: to license purported essential patents on F/RAND terms.  Nokia never told SSOs that it would not be willing to license its purported essential patents on F/RAND terms if it considered the prospective licensee to be a threat competitively, or that it would insist on grantbacks to non-standards-essential patents from potential licensees holding patents that Nokia desired to license.  Nokia's demands for unreasonable royalties and grantbacks also directly contradict numerous statements Nokia has made concerning F/RAND commitments in other legal proceedings and other public fora in which Nokia itself demanded F/RAND licenses from others.

## 2.  Standards Setting Organizations in the Wireless Communications Industry

27.     Mobile wireless carriers offer the consumer access to their "networks" to enable the consumer to, among other things, place and receive calls and access email, the Internet and a variety of services.  The handsets sold by Apple and Nokia include a computer chipset that enables the handset to communicate with the carriers' networks.  Most handset designers – including Apple and Nokia – purchase those chipsets from third-party manufacturers.

28.     To facilitate interoperability among the cellular networks and various cellular mobile devices, carriers, handset manufacturers, and chipset manufacturers, among others, participate in the development of industry technical standards that establish precise specifications for the essential components of the technology.  Once these standards are established, competing manufacturers and competing carriers can offer their own products and services that are compliant with the standards.

29.     As Nokia admits in its Complaint, technical standards play a critical role in the development of wireless data and telecommunications technologies.  In general, technical standards – such as those for mobile wireless technology – may facilitate product development and network creation.  The technical specifications for most standards are published and broadly available.  Product designers and manufacturers are thus more willing to invest heavily in the development of handsets or component parts because, so long as their products are compliant with the published technical standard, those products will operate effectively within the carrier networks and be compatible with other products from third parties.

30.     Standards development also reduces costs for both suppliers and purchasers.  For suppliers, standardization reduces the need in many instances to develop products to a particular purchaser's specifications.  Accordingly, because a single product or product line may be sold to multiple purchasers and distributed more widely, manufacturing volumes increase, and per unit costs decrease.  Purchasers benefit from increased price competition among suppliers.  Because a number of suppliers produce standards-compliant products, switching suppliers typically does not require a substantial redesign of one's products or a substantial technical transfer to enable the new supplier to produce compatible products.  The lower "switching cost" intensifies competition among suppliers, leading to lower prices.

31.     On the other hand, technical standardization also creates a "lock-in" effect and the risk of "patent hold-up." Although standards are the products of coordination and compromise among competitors, certain aspects of standards may be – and often are – claimed by patents. Prior to standardization, the royalty a patentee could earn from a patent license for its technology is constrained in part by the availability of alternative technical approaches to perform that function. If a standard requires a designer to employ that patented technology, however, those other technological approaches are no longer available substitutes and would no longer constrain the patentee's ability to demand excessive royalties not warranted by the intrinsic value of the technology.

32.     This phenomenon is compounded because designers, such as Apple, invest substantial resources developing products that implement the technical standard. Even if there were an alternative standard – and many times there are not – the costs associated with switching may be prohibitively expensive. The designer who implements a standard thus becomes "locked-in." Left unconstrained, owners of patents that purportedly cover certain features within the standard could take advantage of lock-in and demand exorbitant royalties from the designers, knowing that it would be less costly for the designer to pay the excessive royalty than to incur the cost of switching. This is commonly referred to as a patent hold-up.

33.     Most SSOs – including all those relevant to this action – have adopted intellectual property rights policies ("IPR policies") to address the problem of patent hold-up. These policies set forth requirements concerning: (a) the disclosure of patents or patent applications that may claim any portion of the specifications of the standard in development; and (b) whether and to what extent patentees holding such purported essential patents must commit to licensing these patents on F/RAND terms and conditions.

34.     As Nokia admits in its Complaint, timely disclosure of purported essential patents permits those participating in standards development to evaluate competing technical proposals with better knowledge of the potential licensing costs that designers may incur when developing standards-compliant products.

35.     Additionally, as set forth in greater detail below, the IPR policies at issue in this case require participants claiming to own essential patents to commit to license those patents to any implementer of the standard on F/RAND terms.  Those participating in standards development rely on these contractual undertakings to ensure that the widespread adoption of the standard will not be hindered by patentees seeking to extract unreasonable royalties and terms from those implementing the standard.

36.     Breaching F/RAND commitments, as Nokia has done here, undermines the pro-competitive safeguards put in place at SSOs.  By seeking to capitalize on a patent's actual or purported incorporation into a standard, the patentee violates the very commitment that led to incorporation of that technology in the first place.

### 3.   The Evolution of Mobile Wireless Telecommunications Standards

37.     The mass marketing of cell phones began in the 1980s with phones that operated on analog networks.  The two principal disadvantages of analog signals – compared to the digital signals on which later generations of cell phone networking were based – are that analog transmissions have "noise," creating signal loss and distortion; and that analog networks are ill-equipped to handle high volumes of voice traffic or data transmissions.

38.     The second generation of mobile wireless technology, commonly referred to as "2G," began the transition to digital technology.  The rollout of 2G networks – which used available bandwidth for voice traffic more efficiently than did analog and provided support for

the data transmission necessary for paging and text messaging – coincided with the proliferation of consumer mobile wireless sales.

39.     2G networks and advanced 2G networks, sometimes referred to as 2.5G networks, also began supporting more data-intensive applications, such as email, web browsing, and sending and receiving pictures by phone.  The third generation (3G) technologies, which have recently been deployed, were developed to support even more data-intensive operations commonly associated with smartphones like the iPhone, such as multimedia, more sophisticated web browsing, music and video downloading, and global positioning systems.

40.     Nearly all mobile wireless carriers now support 2G technology and in the United States have, or have begun, rolling out 3G networks.  As this is happening, fourth generation (4G), known as Long Term Evolution or LTE for GSM-based networks, has been standardized and some carriers are beginning the process of introducing those networks.

### *(i) GSM Standards*

41.     The most widely implemented digital telecommunications standards worldwide are based on the Global System for Mobile Communications ("GSM") technology, a 2G standard.  Development of GSM began in Europe with the formation of the Groupe Special Mobile within the European Conference of Postal and Telecommunications Administrations ("CEPT").

42.     In 1988, at the urging of the European Commission, European national posts and telecommunications ministries formed the European Telecommunications Standards Institute ("ETSI").  ETSI, a non-profit SSO, is headquartered in France.  In 1989, development of GSM was transferred to the auspices of ETSI, where standardization of GSM was completed.

43.     Subsequent generations of the GSM standard have featured technical enhancements that permit greater data rates and increased voice capacity. Many GSM carriers have adopted a technology known as GSM Packet Radio Service ("GPRS"), 2.5G technology. In addition, a technology known as Enhanced Data Rates for GSM Evolution ("EDGE") is employed by most carriers as an add-on to the GPRS to achieve higher data rates.

44.     The third generation of the GSM platform is the Universal Mobile Telecommunications System (UMTS), which employs wide-band CDMA (WCDMA) technology. The UMTS standard was designed to efficiently support significantly increased speeds and capacity over limited spectrum bandwidth, thereby enabling new and enhanced services and applications such as mobile e-commerce, broadcast television, position location, and mobile multimedia web browsing, including music and video downloads.

45.     UMTS has been standardized both by ETSI and the 3rd Generation Partnership Project (3GPP). 3GPP is a collaboration among groups of telecommunications associations, including ETSI. Its mission was to develop a globally applicable third generation (3G) mobile phone system specification based on GSM technology.

46.     Cellular technology has continued to develop during and after the move to 3G technology. Driven by demand for an increasing number of wireless applications and improved quality of existing applications, carriers wish to offer newer technologies that provide ever-increasing bandwidth supporting more advanced applications such as video and multimedia applications. The industry has already undertaken substantial development of technologies that may be implemented in beyond-third-generation ("B3G") and fourth-generation ("4G") mobile wireless systems, such as LTE.

### (ii) Wi-Fi Standards

47.     "Wi-Fi," or wireless local area networking ("WLAN"), is a technology that enables wireless access to the Internet over short distances.  These networks include access points that are connected to an Ethernet local area network.  The access point, or router, communicates using radio signals with computer devices such as notebook computers.  Increasingly, smartphones – offering computer-like features – include Wi-Fi compatibility as well.

48.     Wi-Fi technology is quickly proliferating in the United States.  Access points, or "hot spots," are common now in homes, offices, hotels, stores, and restaurants.  Wi-Fi-compatible handsets, such as the iPhone, offer much faster connection speeds for Internet browsing when the user is near a hotspot, and also permit Internet access in locations that do not have a strong cellular signal.

49.     Wi-Fi is based on the 802.11 wireless networking standard developed by the Institute of Electrical and Electronics Engineers ("IEEE").  Work on 802.11 began in the early 1990s.  The initial 802.11 protocol ("legacy 802.11") was released in 1997.  Since then, IEEE has issued many amendments, the most important of which are 802.11a (released in 1999), 802.11b (released in 1999), and 802.11g (released in 2003).

### NOKIA'S FALSE COMMITMENTS CONCERNING ITS PURPORTED STANDARDS-ESSENTIAL INTELLECTUAL PROPERTY

50.     Because SSOs – including ETSI and its organizational partner 3GPP, and IEEE – purportedly incorporated Nokia's patented technology into the relevant standards at Nokia's urging, Nokia has the ability to demand and potentially extract exorbitant royalties and unreasonable terms for patents purportedly essential to the GSM, GPRS, EDGE, UMTS, and WLAN standards.  Nokia's representations that it would license its purported standards-essential

patents on F/RAND terms were false, and enabled Nokia to obtain the "hold-up" power it now

abusively seeks to wield. If Nokia had disclosed that it would not offer FRAND licenses to all

implementing the standard, SSO members would have either chosen other viable alternative

technologies competing to perform functions incorporated in the standards or declined to

incorporate into the standards the functions purportedly covered by Nokia's patents. Nokia's

efforts to extract non-F/RAND royalties and its insistence on grantbacks of non-standards-

essential patents violate the condition on which Nokia obtained that power and are both unfair

and anticompetitive.

### 1. Nokia's Participation in ETSI, and its FRAND Commitments

51.    To facilitate its standard setting activity, ETSI promulgated an IPR policy, set

forth in Annex 6 of its Rules of Procedure.

52.    Clause 4 of the policy requires, among other things, that members timely disclose

to the organization any IPR they own that may be essential to standards that have been developed

or are being developed. Participants in ETSI standard development understand that this

provision requires disclosure of all IPR that they believe might be essential to standards under

consideration.

53.    Clause 6 of ETSI's IPR policy governs the availability of licenses to essential

IPR. In relevant part, Clause 6.1 states:

> When an ESSENTIAL IPR relating to a particular STANDARD or
> TECHNICAL SPECIFICATION is brought to the attention of ETSI,
> the Director-General of ETSI shall immediately request the owner to
> give within three months an undertaking in writing that it is prepared
> to grant irrevocable licenses on fair, reasonable and non-
> discriminatory [FRAND] terms and conditions under such IPR to at
> least the following extent:
>
> • MANUFACTURE, including the right to make or have made
>   customized components and sub-systems to the licensee's
>   own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

54.     As Nokia admits in its Complaint, if an owner of an essential IPR refuses to undertake a FRAND commitment with respect to that IPR, then, as provided in Section 8 of the ETSI IPR Policy, ETSI may suspend work on relevant parts of the standard or redesign the standard to render the IPR non-essential.

55.     As Nokia also admits in its Complaint, ETSI's IPR policy was designed to benefit all ETSI members, as well as other parties that implement an ETSI standard.  In particular, the stated objective of the policy, described in Clause 3.1, is to "reduce the risk" to those implementing the standards or other technical specifications "that investment in the preparation, adoption and application of the STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable."

56.     During all times relevant to these allegations, Nokia has been a member of ETSI. Nokia has participated in ETSI's development of mobile wireless communications standards for GSM, GPRS, EDGE, and UMTS.  As a result of its membership and participation in ETSI, Nokia was and is bound by the ETSI Rules of Procedure, including the ETSI IPR Policy.

57.     Nokia was a member of ETSI throughout ETSI's involvement in the development of the GSM, GPRS, EDGE, and UMTS standards.  Nokia has represented to Apple, and has alleged in its Complaint here, that it owns a number of patents that are essential to the GSM, GPRS, EDGE, and UMTS standards and that it disclosed to ETSI before ETSI adopted the standards.  Certain of these patents are identified in Paragraph 1 of Nokia's Complaint.

58.     As Nokia admits in its Complaint, Nokia has submitted declarations to ETSI, committing to grant irrevocable licenses to its purported essential patents on FRAND terms pursuant to Clause 6.1 of ETSI's IPR policy.

59.     Nokia's FRAND declarations were intended to induce ETSI and its members to adopt standards based on technology that Nokia claims is covered by Nokia's patents.

60.     When Nokia made its FRAND declarations to ETSI, Nokia falsely represented that it would provide licenses on FRAND terms and failed to disclose that it would attempt to extract whatever excessive royalties it could, and/or demand other unreasonable terms such as grantbacks of licenses for non-essential patents, from parties practicing the relevant standards, or at the very least from parties that Nokia perceived as a threat competitively.

61.     Before the adoption of the relevant standards, there were other viable alternative technology solutions competing in markets for technologies to perform the functions included in the standards that Nokia asserts now are performed by its patented technologies. Once the ETSI participants selected technologies – technologies that Nokia claims are covered by its patents – all alternative technological solutions for those functions were excluded from the relevant technology markets. Accordingly, to the extent that Nokia's Asserted Patents are essential to any standard, which Apple denies, it was the false F/RAND declarations – not the inherent attributes of its purportedly essential technologies – that conferred monopoly power on Nokia with respect to the technologies that perform the functions included in the standards.

62.     As Nokia admits in its complaint, Nokia's FRAND declaration are binding contractual commitments made to ETSI, its members and designers and sellers of products implementing ETSI standards (including Apple), for the benefit of ETSI, its members, and any entity that implements GSM, GPRS, EDGE, or UMTS (or any other ETSI standards for which

Nokia declared essential IPR and undertook a FRAND commitment). Nokia is therefore bound to offer FRAND licenses in accordance with Clause 6.1 of ETSI's IPR policy to Apple, a seller of products that implement the relevant standards and presently a member of ETSI.

63.     Apple, other members of ETSI, and other companies implementing ETSI standards reasonably relied on Nokia's FRAND commitments: to (a) grant licenses to those patents and patents under application Nokia claims are essential to implement an ETSI standard; (b) license those patents on fair, reasonable, and non-discriminatory terms; and (c) not to seek to impose unfair, unreasonable, and discriminatory conditions on licensing such as grantbacks of patents not essential to any standards but covering proprietary technology. In particular, they relied on these commitments to ensure that the royalties Nokia charged, and the terms on which it licensed, would permit efficient competitors such as Apple to offer standards-compliant products profitably in competition with Nokia and other owners of purportedly essential patents.

64.     Apple has invested substantial resources in developing and marketing its iPhone products in reliance on Nokia's FRAND commitments.

## 2.   Nokia's Participation in IEEE, and its RAND Assurances

65.     The IEEE Standards Association, has, among other things, managed the development of the 802.11 (WLAN) standard and its amendments. Under the IEEE's IPR policy, when participants learned of patents or patent applications that might be essential to standards, IEEE would request "letters of assurance" from the owners of that intellectual property.

66.     The letters of assurance sought by IEEE provide either a general disclaimer that the patentee will not enforce the patent(s), or a promise by the patentee that it will license the

patent(s) to an unrestricted number of applicants at either no cost or under reasonable terms and conditions that are demonstrably free of any unfair discrimination (*i.e.*, on RAND terms).

67.   IEEE's IPR policy also states that if any party submitting a letter of assurance with respect to certain patents becomes aware of additional essential patents not covered by prior letter(s) of assurance, it must submit an additional assurance for the newly discovered patent(s).

68.   According to IEEE's IPR policy, letters of assurances, once provided, are irrevocable and shall be in force at least until the standard is withdrawn.   Additionally, any subsequent assignee and transferee of the patent(s) must agree to abide by any assurances in place.

69.   If the letters of assurance were not provided for essential patents, the IEEE working group would either revise the standard so that compliance could be achieved without infringing the patent(s), or discontinue work on the standard altogether.

70.   Nokia has represented to Apple, and alleges in its Complaint, that it owns a number of patents that are essential to comply with the WLAN standard.   Some of these patents are identified in Paragraph 1 of Nokia's Complaint.

71.   As Nokia admits in its Complaint, Nokia submitted letters of assurance to IEEE with respect to certain of its patents, including patents-in suit.

72.   When Nokia made its RAND declarations to IEEE, Nokia falsely represented that it would provide licenses on RAND terms and failed to disclose that it would attempt to extract whatever excessive royalties it could, and/or to demand other unreasonable terms such as grantbacks of patent licenses, from parties practicing the relevant standards, or at the very least from parties whom Nokia perceived as a threat competitively.

73.     Before the adoption of the standard, there were alternative technology solutions competing in markets for technologies to perform the functions included in the standards that Nokia asserts now are performed by its patented technologies.  Once the IEEE participants selected the technologies embodied in the standard, all alternative technological solutions for those functions were excluded from the relevant technology markets.  Accordingly, to the extent that Nokia's Asserted Patents are essential to any standard, which Apple denies, it was the false RAND declarations – not the inherent attributes of its purportedly essential technologies – that conferred monopoly power on Nokia with respect to the technologies that perform the functions included in the standards.

74.     As Nokia admits in its Complaint, Nokia's letters of assurance are binding contractual commitments to IEEE, its members, and designers and sellers of products implementing IEEE standards (including Apple), for the benefit of IEEE members and any entity that implements the 802.11 standard.  Nokia is therefore bound by its agreements to offer RAND licenses to Apple, a seller of products that implement the relevant standard and presently a member of IEEE.

75.     Apple, other companies participating in the development of Wi-Fi in IEEE, and other companies implementing the WLAN standard reasonably relied on Nokia's RAND commitment to license patents it claims are essential on reasonable and non-discriminatory terms.  In particular, they relied on these commitments to ensure that the royalties Nokia charged and the terms on which it licensed would permit efficient competitors such as Apple to offer standards-compliant products profitably in competition with Nokia and other owners of essential patents.

76.     Apple has invested substantial resources in developing and marketing its products, including its iPhone products, in reliance on Nokia's letters of assurance concerning the WLAN standard.

## NOKIA'S BREACH OF ITS CONTRACTUAL OBLIGATION TO LICENSE ITS PURPORTEDLY ESSENTIAL PATENTS ON F/RAND TERMS

77.     Although Nokia admits that it made F/RAND commitments to ETSI and IEEE, and although Nokia concedes that it was thereby obligated to offer Apple a license to those patents on F/RAND terms, Nokia has refused to extend F/RAND licensing terms to Apple for any of Nokia's purported essential patents. Instead, Nokia has demanded of Apple royalties and other terms that are unfair, unreasonable, and discriminatory.

78.     Specifically, in or about late 2007, Apple and Nokia began negotiating a licensing agreement for Nokia's portfolio of patents that Nokia claims are essential to the GSM, GPRS, EDGE, UMTS, and WLAN standards.

79.     Throughout the negotiations, Apple made clear to Nokia that, except for one specific family of patents, Apple would not agree to cross-license to Nokia any of its patents (in particular those relating to iPhone technology) that were not essential to relevant industry standards, such as GSM, GPRS, EDGE, UMTS, and WLAN.

80.     Apple has no obligation, under any law or otherwise, to license these non-standards-essential patents to Nokia. Thus, Nokia is seeking unlawfully and unfairly to leverage the monopoly power it obtained from its false F/RAND commitments to SSOs to obtain licenses to Apple's proprietary technology (to which Nokia is not entitled) that would enable Nokia to try to develop products with features now unique to the iPhone. Nokia's demand for license terms that are unfair, unreasonable, and discriminatory constitutes a breach of Nokia's F/RAND commitments.

81.     In particular, in or about the spring of 2008, Nokia demanded that, as part of its compensation for licensing Nokia's portfolio of purported essential patents, Apple must grant Nokia a license to a particular number of Apple non-standards-essential patents – and that Nokia could then, during the term of the license, "pick" the specific Apple patents for which Nokia would take a license.  Apple immediately rejected the proposal and reiterated Apple's position that Nokia's F/RAND obligations required it to license Nokia's purportedly essential technologies on fair, reasonable, and non-discriminatory terms whether or not Apple was interested in licensing to Nokia Apple's non-standards-essential patents – which Apple was not.

82.     Approximately a year later, in or about May 2009, Nokia demanded a royalty approximately three times as much as the royalty proposed the prior spring, which was itself in excess of a F/RAND rate, as well as "picks" to Apple's non-standards-essential patents.  Nokia never represented that its 2008 demand was below F/RAND, and its tripling of that demand in May 2009 was in flagrant violation of its F/RAND commitments.  Apple again refused to agree to this non-F/RAND royalty demand or to provide "picks" to its non-standards-essential patents.

83.     Finally, Nokia made demands in or about September 2009, just prior to filing suit, for highly excessive royalties virtually identical to those sought by Nokia two years earlier at the outset of the parties' negotiation.

## NOKIA HAS ENGAGED IN ANTICOMPETITIVE AND UNFAIR CONDUCT THAT HAS INJURED AND WILL INJURE APPLE AND COMPETITION IN MOBILE WIRELESS TECHNOLOGY MARKETS

84.     Nokia's unlawful conduct has had and will continue to have a substantial anticompetitive effect on several Mobile Wireless Technology Markets defined below.

85.     In developing the standards at issue here, SSO participants sought to select the appropriate technology to provide each individual function required for the relevant standard. SSO participants evaluated and selected among viable alternative competing technologies that

were capable of performing each required function.  They selected among the alternatives based on technical and commercial merit and intellectual property considerations, including whether the alternative included technology that was protected by disclosed patents and, if so, whether the party claiming to own that technology had committed to make it available on F/RAND terms. Thus, before the SSOs adopted the standard, there were multiple competing alternative technology solutions in markets consisting of technologies to perform each relevant function.

86.     Each GSM, GPRS, EDGE, UMTS, and WLAN standard consists of many different technological functions.  The technologies that perform these functions are essential inputs into the manufacture of products and services that comply with the standard.

87.     Because each of the standards at issue here specifies a set of distinct technologies to perform the various functions within the standard, once a standard was adopted, with respect to those functions that are in fact essential, there were, by definition, no substitutes for the standardized technologies on which each technology is based.

88.     Once SSO participants selected a single technology to perform a particular function needed to practice a standard, all alternative technological solutions for that standard were effectively excluded from use in connection with performing that function.  Thus, the selection of a particular, essential technology in that standardization process reduced to a single option the technology to perform each such essential function necessary to practice the standard. Parties implementing the standard are thus "locked-in" to the technology.

89.     If the technology selected for inclusion in the standard is protected by patents, the patent owner controls the supply of that particular technological input for the standard.  This is true for each function comprising the standard for which patented technology was selected.

90.     Nokia claims to own patents essential to practice the technologies that are used for certain individual functions of the GSM standard, the GPRS standard, the EDGE standard, the UMTS standard, and the WLAN standard.

91.     The relevant markets in which to assess Nokia's conduct, therefore, are markets for technologies that – before the standards were implemented – were competing to perform the functions covered by Nokia's purported essential patents for the GSM standard (the "GSM technology markets"), the GPRS standard (the "GPRS technology markets"), the EDGE standard (the "EDGE technology markets"), the UMTS standard (the "UMTS technology markets"), and the WLAN standard (the "WLAN technology markets") (collectively, the relevant "Mobile Wireless Technology Markets").

92.     The standards described above are employed throughout the world. Accordingly, the geographic scope of each of the relevant Mobile Wireless Technology Markets described above is worldwide.

93.     If Nokia in fact has patents covering technologies that have been incorporated into the relevant standards, it has the power to raise price and exclude competition with respect to each of the technologies covered by its patents and incorporated in the relevant standards, and acquired that power as a result of its false F/RAND commitments. Barriers to entry into these markets are high because, among other reasons, no new technology can replace the technologies the standards specify to perform functions included in the standards.

## NOKIA HAS ENGAGED IN UNFAIR AND ANTICOMPETITIVE CONDUCT THAT THREATENS TO INJURE APPLE AND COMPETITION IN THE DOWNSTREAM MARKETS FOR MOBILE WIRELESS COMMUNICATIONS DEVICES

94.     Nokia's refusal to honor its F/RAND commitments concerning the GSM, GPRS, UMTS, EDGE, and WLAN standards also is designed to harm a more successful competitor in

the downstream markets for mobile wireless communications devices in which Apple and Nokia compete.

95.     By failing to comply with its commitments to offer F/RAND licenses to implementers of the various relevant standards, and by seeking to coerce Apple to accept unreasonable royalty terms by the threat of an injunction, Nokia seeks to raise the costs of its rival, Apple.  Moreover, Nokia's conduct more broadly threatens to further increase royalties and other costs associated with the manufacture and sale of downstream products and services that employ the GSM standard, the GPRS standard, the EDGE standard, the UMTS standard, and the WLAN standard, resulting in increased prices and decreased quality and innovation for downstream products and services.

## **ANTICOMPETITIVE EFFECTS OF NOKIA'S CONDUCT**

96.     The foregoing conduct by Nokia has caused and threatens to cause harm to competition.  These anticompetitive effects include each of the following.

(a)     By making false F/RAND commitments to SSOs, Nokia has improperly foreclosed competition in the GSM technology markets, the GPRS technology markets, the EDGE technology markets, the UMTS technology markets, and the WLAN technology markets; competing, alternative technologies to perform functions necessary to practice the standard are no longer viable.

(b)     Nokia's conduct significantly threatens to further increase costs associated with the manufacture and sale of downstream products that employ the GSM, GPRS, EDGE, UMTS, and WLAN standards.

97.     Such harm will continue unless and until the Court issues appropriate relief as requested below.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Breach of Contract – F/RAND)

98.     Apple repeats and re-alleges all of the allegations in Paragraphs 1 through 97 above, as if set forth fully herein.

99.     As set forth above, by committing to license its purported essential patents to adopters of the GSM, GPRS, EDGE, and UMTS standards on FRAND terms, Nokia entered into express or implied contractual commitments with ETSI, ETSI's members, and designers and sellers of products that implement ETSI standards.

100.    Further, by committing to license its purportedly essential patents to adopters of the WLAN standard on RAND terms, Nokia entered into express or implied contractual commitments with IEEE, IEEE's members, and designers and sellers of products that implement the WLAN standard.

101.    Each potential third party implementing the GSM, GPRS, EDGE, UMTS, and WLAN standards – including Apple – is an intended third party beneficiary of Nokia's contractual commitments to ETSI and IEEE.   It was material, indeed critical, to Nokia's contractual commitments to ETSI and IEEE that Nokia offer F/RAND licensing terms to all adopters of the GSM, GPRS, EDGE, UMTS, and WLAN standards – including Apple.

102.    Nokia breached these contracts by refusing to offer licenses to patents it claims are essential to the various standards on F/RAND terms and instead demanding unfair, unreasonable, and discriminatory royalties and other concessions such as grantbacks of licenses to Apple's non-standards essential patents, and by seeking an injunction against Apple's practicing the patents it claims are essential to the various mobile wireless standards.

103.    As a result of these multiple contractual breaches, Apple has been injured, including in its business or property.  Apple has been forced to expend resources resolving this licensing dispute, and is threatened, in particular, by loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

## SECOND CAUSE OF ACTION

### (Promissory Estoppel)

104.    Apple repeats and re-alleges the allegations in Paragraphs 1 through 103 above as if set forth fully herein.

105.    Nokia made clear and definite promises to potential licensees through its commitments to various SSOs that it would license its purported essential patents on F/RAND terms.

106.    The intended purpose of Nokia's promises was to induce reliance.  Nokia knew or should have reasonably expected that these promises would induce sellers of mobile wireless devices, like Apple, to develop products compliant with the relevant standards.

107.    Apple developed and marketed its products and services in reliance on Nokia's promises, as described above, including making its products and services compliant with GSM, GPRS, EDGE, UMTS, and WLAN technical standards.

108.    Nokia is estopped from reneging on these promises to the various SSOs, their members and designers and sellers of products implementing those standards, under the doctrine of promissory estoppel.

109.    Apple has been harmed as a result of its reasonable reliance on Nokia's promises.  Apple has been forced to expend resources resolving this licensing dispute, and is threatened by

the loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

## THIRD CAUSE OF ACTION

### (Unfair Competition under Cal. Bus. & Prof. Code § 17200)

110.    Apple restates and incorporates by reference the allegations in paragraphs 1 through 109 above as if set forth fully herein.

111.    By the acts alleged, Nokia has engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

112.    Specifically, Nokia's false F/RAND commitments to ETSI and IEEE, and its refusal to license patents that it claims to be essential to the standards implemented by those organizations on fair, reasonable, and nondiscriminatory terms, constitute (1) unlawful business acts or practices and/or (2) unfair business acts or practices, including unfair business practices violating the policy or spirit of the antitrust laws, and otherwise significantly threatening and harming competition in California and elsewhere.

113.    Nokia committed unlawful business acts or practices by breaching the contracts described above.

114.    Nokia committed unfair and deceptive business acts or practices by making false F/RAND commitments and then refusing to offer F/RAND terms to Apple in subsequent licensing discussions.  Each of these acts and practices is unfair in the circumstances when the effect of the act or practice on Apple is balanced against Nokia's reasons, justifications, and motives.

115.    The acts complained of above violate and threaten to violate the policy of the antitrust laws and otherwise significantly threaten and/or harm competition.  By the deceptive acts, practices, and conduct alleged above, Nokia wrongfully acquired monopoly power in the Mobile Wireless Technologies Markets, and has abused that power by refusing to license its purported essential patents on F/RAND terms and by demanding other unreasonable conditions such as grantbacks to Apple's non-essential patents, and by threatening an injunction.

116.    As a direct, proximate, and foreseeable result of Nokia's wrongful conduct, as alleged above, Apple has suffered harm in California and elsewhere, including the unavailability of a F/RAND license despite Nokia's assurance that it would offer such F/RAND licenses, being forced to expend resources to defend a suit for patent infringement, and is threatened, in particular, by loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

117.    As a direct, proximate, and foreseeable result of Nokia's wrongful conduct, as alleged above, competition been injured in the Mobile Wireless Technologies Markets, and there is a significant threat of injury in downstream markets for mobile wireless communication devices, thereby causing injury to consumers in California and elsewhere, including the inevitable passing on to consumers of improper royalties demanded by Nokia.

## FOURTH CAUSE OF ACTION

### (Declaratory Judgment that Nokia's offers have not been on F/RAND terms)

118.    Apple restates and incorporates by reference the allegations in Paragraphs 1 through 117 above as if set forth fully herein.

119.    There is a dispute between the parties concerning whether the terms on which Nokia has offered to license its purported essential patents to Apple are fair, reasonable, and nondiscriminatory.  Nokia has alleged in its Complaint that it has offered Apple a license on such terms, and as set out above, Apple vigorously denies this.

120.    The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

121.    Apple is entitled to a declaratory judgment that Nokia has not to date offered it a license on F/RAND terms.

### FIFTH CAUSE OF ACTION

### (Declaratory Judgment of No Entitlement to Injunctive Relief)

122.    Apple restates and incorporates by reference the allegations in Paragraphs 1 through 121 above as if set forth fully herein.

123.    There is a dispute between the parties whether Nokia is entitled to injunctive relief in the event that it prevails on any of its patent infringement claims.  Despite having admitted and contended in other litigation that a patent holder waives all rights to seek injunctive relief upon making a F/RAND commitment, Nokia seeks injunctive relief against Apple in its Complaint.  Apple contends, as Nokia has contended in other litigation, that Nokia's sole remedy in this case is to seek payment of royalties on F/RAND terms.

124.    The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

125.    Apple is entitled to a declaratory judgment that Nokia is not entitled to injunctive relief even if it proves patent infringement.

## SIXTH CAUSE OF ACTION

### (Declaratory Judgment of Patent Misuse)

126.    Apple restates and incorporates by reference the allegations in paragraphs 1 through 125 above as if set forth fully herein.

127.    Nokia has sued Apple for patent infringement, and the parties dispute whether Nokia's asserted patents are enforceable.  The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

128.    Nokia's false representations to SSOs that it would license the patents it declared essential, including the patents-in-suit, on F/RAND terms and Nokia's assertion of its wrongly obtained monopoly power against Apple constitutes patent misuse and renders the patents unenforceable.

129.    Nokia's demand for a grantback license to Apple's non-standard essential patents as a condition for licensing Nokia's purported essential patents at a FRAND royalty rate constitutes misuse of Nokia's purported essential patents.

130.    The anticompetitive effects of Nokia's patent misuse include injury to competition in the Mobile Wireless Technologies Markets, threatened injury to competition in downstream markets for mobile wireless communication devices and injury to consumers in California and elsewhere as a result of the inevitable passing on to consumers of improper royalties demanded by Nokia.

131.    Apple is entitled to a declaratory judgment that Nokia's purported essential patents, including the patents-in-suit, are unenforceable by virtue of Nokia's misuse of those patents.

## SEVENTH CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '465 Patent)

132.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

133.    Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '465 Patent.

134.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '465 Patent.

## EIGHTH CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '465 Patent)

135.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

136.    One or more claims of the '465 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

137.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '465 Patent is invalid.

## NINTH CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '178 Patent)

138.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

139.    Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '178 Patent.

140.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '178 Patent.

## TENTH CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '178 Patent)

141.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

142.    One or more claims of the '178 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

143.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '178 Patent is invalid.

## ELEVENTH CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '651 Patent)

144.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

145.    Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '651 Patent.

146.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '651 Patent.

## TWELFTH CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '651 Patent)

147.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

148.    One or more claims of the '651 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

149.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '651 Patent is invalid.

### THIRTEENTH CAUSE OF ACTION

#### (Declaratory Judgment of Non-Infringement of the '904 Patent)

150.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

151.    Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '904 Patent.

152.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '904 Patent.

### FOURTEENTH CAUSE OF ACTION

#### (Declaratory Judgment of Invalidity of the '904 Patent)

153.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

154.    One or more claims of the '904 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

155.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '904 Patent is invalid.

## FIFTEENTH CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '135 Patent)

156.   Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

157.   Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '135 Patent.

158.   To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '135 Patent.

## SIXTEENTH CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '135 Patent)

159.   Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

160.   One or more claims of the '135 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

161.   To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '135 Patent is invalid.

## SEVENTEENTH CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '548 Patent)

162.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

163.    Apple has not directly or indirectly infringed and is not directly or indirectly infringing  any valid claim of the '548 Patent.

164.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '548 Patent.

## EIGHTEENTH CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '548 Patent)

165.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

166.    One or more claims of the '548 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

167.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '548 Patent is invalid.

## NINETEENTH CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '727 Patent)

168.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

169.    Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '727 Patent.

170.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '727 Patent.

## TWENTIETH CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '727 Patent)

171.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

172.    One or more claims of the '727 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

173.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '727 Patent is invalid.

## TWENTY-FIRST CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '940 Patent)

174.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

175.    Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '940 Patent.

176.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '940 Patent.

## TWENTY-SECOND CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '940 Patent)

177.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

178.    One or more claims of the '940 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

179.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '940 Patent is invalid.

## TWENTY-THIRD CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '672 Patent)

180.   Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

181.   Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '672 Patent.

182.   To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '672 Patent.

## TWENTY-FOURTH CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '672 Patent)

183.   Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

184.   One or more claims of the '672 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

185.   To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '672 Patent is invalid.

## TWENTY-FIFTH CAUSE OF ACTION

### (Declaratory Judgment of Non-Infringement of the '621 Patent)

186.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

187.    Apple has not directly or indirectly infringed and is not directly or indirectly infringing any valid claim of the '621 Patent.

188.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that it has not infringed and is not infringing any valid, enforceable claim of the '621 Patent.

## TWENTY-SIXTH CAUSE OF ACTION

### (Declaratory Judgment of Invalidity of the '621 Patent)

189.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 131 as if set forth fully herein.

190.    One or more claims of the '621 Patent are invalid for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and/or 112.

191.    To resolve the legal and factual questions raised by Nokia and to afford relief from the uncertainty and controversy that Nokia's accusations have precipitated, Apple is entitled to a declaratory judgment that the '621 Patent is invalid.

## TWENTY-SEVENTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,634,074)

192.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

193.    On May 27, 1997, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 5,634,074 (the "'074 Patent") entitled Serial I/O Device Identifies Itself to a Computer Through a Serial Interface During Power on Reset Then it is Being Configured by the Computer.  A copy of the '074 Patent is attached as Exhibit A.  By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '074 Patent, including the right to sue and collect for damages for past infringement.

194.    Nokia has infringed and continues to infringe at least one claim of the '074 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '074 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271.  The infringing Nokia products or services include, but are not limited to, Nokia products having USB functionality, including, but not limited to, the Nokia E71.

195.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

196.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '074 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

197.    Nokia's continued infringement of the '074 Patent has and will continue to cause irreparable injury to Apple unless Nokia's infringement activities are enjoined by this Court.

**TWENTY-EIGHTH CAUSE OF ACTION**

**(Infringement of U.S. Patent No. 6,343,263 B1)**

198.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 -- 97 as if set forth fully herein.

199.    On January 29, 2002, the USPTO duly and legally issued U.S. Patent No. 6,343,263 B1 (the "'263 Patent") entitled Real-Time Signal Processing System For Serially Transmitted Data. A copy of the '263 Patent is attached as Exhibit B. By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '263 Patent, including the right to sue and collect for damages for past infringement.

200.    Nokia has infringed and continues to infringe at least one claim of the '263 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '263 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271. The Nokia infringing products or services include, but are not

limited to, Nokia handsets using the S60 and/or Symbian platform, including, but not limited to, the Nokia E71.

201.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

202.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '263 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

203.    Nokia's continued infringement of the '263 Patent has and will continue to cause irreparable injury to Apple unless Nokia's infringement activities are enjoined by this Court.

## TWENTY-NINTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,915,131)

204.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

205.    On June 22, 1999, the USPTO duly and legally issued U.S. Patent No. 5,915,131 (the "'131 Patent") entitled Method and Apparatus for Handling I/O Requests Utilizing Separate Programming Interfaces to Access Separate I/O Services.  A copy of the '131 Patent is attached as Exhibit C.  By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '131 Patent, including the right to sue and collect for damages for past infringement.

206.    Nokia has infringed and continues to infringe at least one claim of the '131 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling,

offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '131 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271.  The infringing Nokia products or services include, but are not limited to, Nokia handsets using the S60 and/or Symbian platform, including, but not limited to, the Nokia E71.

207.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

208.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '131 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

209.    Nokia's continued infringement of the '131 Patent has and will continue to cause irreparable harm.

## THIRTIETH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,555,369)

210.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

211.    On September 10, 1996, the USPTO duly and legally issued U.S. Patent No. 5,555,369 (the "'369 Patent") entitled Method of Creating Packages for a Pointer-Based Computer System.  A copy of the '369 Patent is attached as Exhibit D.  By assignment, Apple

has acquired and continues to maintain all rights, title, and interest in and to the '369 Patent, including the right to sue and collect for damages for past infringement.

212.    Nokia has infringed and continues to infringe at least one claim of the '369 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '369 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271. The infringing Nokia products or services include, but are not limited to, Carbide.c++.

213.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

214.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '369 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

215.    Nokia's continued infringement of the '369 Patent has and will continue to cause irreparable harm.

**THIRTY-FIRST CAUSE OF ACTION**

**(Infringement of U.S. Patent No. 6,239,795 B1)**

216.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

217.    On May 29, 2001, the USPTO duly and legally issued U.S. Patent No. 6,239,795 B1 (the "'795 Patent") entitled Pattern and Color Abstraction in a Graphical User Interface. A copy of the '795 Patent is attached as Exhibit E. By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '795 Patent, including the right to sue and collect for damages for past infringement.

218.    Nokia has infringed and continues to infringe at least one claim of the '795 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '795 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271. The infringing Nokia products or services include, but are not limited to, Nokia handsets using the Series 40, S60 and/or Symbian platforms, including, but not limited to, the Nokia 5310, the Nokia E71, and the Nokia N900.

219.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

220.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '795 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

221.    Nokia's continued infringement of the '795 Patent has and will continue to cause irreparable harm.

## THIRTY-SECOND CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,315,703)

222.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

223.    On May 24, 1994, the USPTO duly and legally issued U.S. Patent No. 5,315,703 (the "'703 Patent") entitled Object-Oriented Notification Framework System.  A copy of the '703 Patent is attached as Exhibit F.  By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '703 Patent, including the right to sue and collect for damages for past infringement.

224.    Nokia has infringed and continues to infringe at least one claim of the '703 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '703 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271.  The infringing Nokia products or services include, but are not limited to, the Nokia handsets using the S60 and/or Symbian platform, including, but not limited to, the Nokia E71.

225.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit, including the '703 Patent.

226.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '703 Patent that justifies an increase of up to three times the damages to be

assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

227.    Nokia's continued infringement of the '703 Patent has and will continue to cause irreparable harm.

## THIRTY-THIRD CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,189,034 B1)

228.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

229.    On February 13, 2001, the USPTO duly and legally issued U.S. Patent No. 6,189,034 B1 (the "'034 Patent") entitled Method and Apparatus for Dynamic Launching of a Teleconferencing Application Upon Receipt of a Call.  A copy of the '034 Patent is attached as Exhibit G.  By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '034 Patent, including the right to sue and collect for damages for past infringement.

230.    Nokia has infringed and continues to infringe at least one claim of the '034 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '034 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271.  The infringing Nokia products or services include, but are not limited to, Nokia handsets using the Series 40, S60 and/or Symbian platforms, including, but not limited to, the Nokia E71.

231. Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

232. Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '034 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

233. Nokia's continued infringement of the '034 Patent has and will continue to cause irreparable harm.

### THIRTY-FOURTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 7,469,381 B2)

234. Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

235. On December 23, 2008, the USPTO duly and legally issued U.S. Patent No. 7,469,381 B2 (the "'the '381 Patent") entitled List Scrolling and Document Translation, Scaling, and Rotation on a Touch-Screen Display. A copy of the '381 Patent is attached as Exhibit H. By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '381 Patent, including the right to sue and collect for damages for past infringement.

236. Nokia has infringed and continues to infringe at least one claim of the '381 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '381 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct

infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271. The infringing Nokia products or services include, but are not limited to, the Nokia N900.

237.   Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

238.   Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '381 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

239.   Nokia's continued infringement of the '381 Patent has and will continue to cause irreparable harm.

## THIRTY-FIFTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. RE 39,486 E)

240.   Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

241.   On February 6, 2007, the USPTO duly and legally issued U.S. Patent No. RE 39,486 E (the "'486 Patent") entitled Extensible, Replaceable Network Component System. A copy of the '486 Patent is attached as Exhibit I. By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '486 Patent, including the right to sue and collect for damages for past infringement.

242.   Nokia has infringed and continues to infringe at least one claim of the '486 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling,

offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '486 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271. The infringing Nokia products or services include, but are not limited to, Nokia handsets using the S60 and/or Symbian platforms, including, but not limited to, the Nokia E71.

243.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

244.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '486 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

245.    Nokia's continued infringement of the '486 Patent has and will continue to cause irreparable harm.

### THIRTY-SIXTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,455,854)

246.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

247.    On October 3, 1995, the USPTO duly and legally issued U.S. Patent No. 5,455,854 (the "'854 Patent") entitled Object-Oriented Telephony System. A copy of the '854 Patent is attached as Exhibit J. By assignment, Apple has acquired and continues to maintain all

rights, title, and interest in and to the '854 Patent, including the right to sue and collect for damages for past infringement.

248.   Nokia has infringed and continues to infringe at least one claim of the '854 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '854 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271.  The infringing Nokia products or services include, but are not limited to, Nokia handsets using the S60 and/or Symbian platform, including, but not limited to, the Nokia E71.

249.   Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit, including the '854 Patent.

250.   Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '854 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

251.   Nokia's continued infringement of the '854 Patent has and will continue to cause irreparable harm.

## THIRTY-SEVENTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 7,383,453 B2)

252.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

253.    On June 3, 2008, the USPTO duly and legally issued U.S. Patent No. 7,383,453 B2 (the "'453 Patent") entitled Conserving Power by Reducing Voltage Supplied to an Instruction-Processing Portion of a Processor.  A copy of the '453 Patent is attached as Exhibit K.  By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '453 Patent, including the right to sue and collect for damages for past infringement.

254.    Nokia has infringed and continues to infringe at least one claim of the '453 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '453 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271.  The infringing Nokia products or services include, but are not limited to, the Nokia N900.

255.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

256.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '453 Patent that justifies an increase of up to three times the damages to be

assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

257.    Nokia's continued infringement of the '453 Patent has and will continue to cause irreparable harm.

## THIRTY-EIGHTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,848,105)

258.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

259.    On December 8, 1998, the USPTO duly and legally issued U.S. Patent No. 5,848,105 (the "'105 Patent") entitled GMSK Signal Processors for Improved Communications Capacity and Quality. A copy of the '105 Patent is attached as Exhibit L. By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '105 Patent, including the right to sue and collect for damages for past infringement.

260.    Nokia has infringed and continues to infringe at least one claim of the '105 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '105 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271. The infringing Nokia products or services include, but are not limited to, Nokia cellular handsets having GSM functionality, including, but not limited to, the Nokia 5310, Nokia E71, and Nokia N900.

261.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

262.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '105 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

263.    Nokia's continued infringement of the '105 Patent has and will continue to cause irreparable harm.

### THIRTY-NINTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,379,431)

264.    Apple repeats and realleges the allegations of the preceding counterclaim Paragraphs 1 – 97 as if set forth fully herein.

265.    On January 3, 1995, the USPTO duly and legally issued U.S. Patent No. 5,379,431 (the "'431 Patent") entitled Boot Framework Architecture for Dynamic Staged Initial Program Load. A copy of the '431 Patent is attached as Exhibit M. By assignment, Apple has acquired and continues to maintain all rights, title, and interest in and to the '431 Patent, including the right to sue and collect for damages for past infringement.

266.    Nokia has infringed and continues to infringe at least one claim of the '431 Patent, either literally or by the doctrine of equivalents, either directly by making, using, selling, offering for sale and/or importing into the United States products and/or services that infringe one or more of the claims of the '431 Patent, contributorily where the direct infringement occurs by the activities of the end users of the products or services, by inducement where the direct

infringement occurs by the activities of the end users of the products or services, or otherwise, in violation of 35 U.S.C. § 271. The infringing Nokia products or services include, but are not limited to, Nokia handsets having camera functionality, including, but not limited to, Nokia handsets using the S60 and/or Symbian platform, including, but not limited to, the Nokia E71.

267.    Nokia reviewed Apple's patent portfolio prior to its filing of this action, and, in addition, Apple has identified various specific patents to Nokia prior to Nokia's commencement of this lawsuit.

268.    Nokia has engaged in and/or is now engaging in willful and deliberate infringement of the '431 Patent that justifies an increase of up to three times the damages to be assessed pursuant to 35 U.S.C. § 284 and further qualifies this action as an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

269.    Nokia's continued infringement of the '431 Patent has and will continue to cause irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Apple requests that the Court:

a.    Dismiss the Complaint in its entirety, with prejudice;

b.    Enter judgment in favor of Apple and against Nokia;

c.    Adjudge and decree that Nokia is liable for breach of contract, promissory estoppel, and/or violation of Cal. Bus. & Prof Code § 17200;

d.    On Apple's First, Second, and Third claims for relief, enter judgment against Nokia for the amount of damages Apple proves at trial;

e.    On Apple's Fourth claim for relief, enter judgment declaring that the terms offered by Nokia to Apple to license patents it claims are essential to implement the GSM,

GPRS, EDGE, UMTS, and WLAN standards, including the patents at issue in the Complaint, are not F/RAND terms;

       f.     On Apple's Fifth claim for relief, enter judgment declaring that Nokia is not entitled under any circumstances to seek injunctive relief preventing Apple from practicing the GSM, GPRS, EDGE, UMTS, and WLAN standards;

       g.     On Apple's Sixth claim for relief, enter judgment declaring that Nokia's purported essential patents, including the patents-in-suit, are unenforceable by virtue of Nokia's patent misuse;

       h.     Declare that Apple has not infringed, and is not infringing, each of the Nokia Asserted Patents;

       i.     Declare that one or more of the claims of each of the Nokia Asserted Patents are invalid, void and/or unenforceable against Apple;

       j.     Declare that Nokia has infringed one or more claims of each of U.S. Patent Nos. 5,634,074; 6,343,263 B1; 5,915,131; 5,555,369; 6,239,795 B1; 5,315,703; 6,189,034 B1; 7,469,381 B2; RE 39,486 E; 5,455,854; 7,383,453 B2; 5,848,105; and 5,379,431 (collectively, the "Apple Asserted Patents");

       k.     Declare that Nokia's infringement of one or more claims of the Apple Asserted Patents is and/or has been willful;

       l.     Award a preliminary and permanent injunction prohibiting Nokia, its subsidiaries, divisions, agents, servants, employees, and those in privity with Nokia from infringing, contributing to the infringement of, and inducing infringement of the Apple Asserted Patents, and for further proper injunctive relief.

m.   Award to Apple damages for Nokia's infringement with interest, as well as costs (including expert fees), disbursements, and reasonable attorneys' fees incurred in this action, pursuant to 35 U.S.C. § 285;

n   Award Apple treble damages pursuant to 35 U.S.C. § 284; and

o.   Grant such further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff Apple hereby demands trial by jury on all issues so triable raised by the Complaint or by this Counterclaim.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

William F. Lee
WILMERHALE
60 State Street
Boston, MA  02109
Tel:  617 526 6000

Mark D. Selwyn
WILMERHALE
1117 California Avenue
Palo Alto, CA  94304
Tel:  (650) 858-6000

Kenneth H. Bridges
Michael T. Pieja
WONG CABELLO
540 Cowper Street
Suite 100
Palo Alto, CA
Tel:  (650) 681-4475

Dated:  December 11, 2009
945916 / 35035

By:   */s/ Richard L. Horwitz*
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant and
Counterclaim-Plaintiff Apple Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, Richard L. Horwitz, hereby certify that on December 11, 2009, the attached document

was electronically filed with the Clerk of the Court using CM/ECF which will send notification

to the registered attorney(s) of record that the document has been filed and is available for

viewing and downloading.

I hereby certify that on December 11, 2009, the attached document was electronically

mailed to the following person(s)

Jack B. Blumenfeld
Rodger D. Smith II
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE  19899
jblumenfeld@mnat.com
rsmith@mnat.com

Patrick J. Flinn
John D. Haynes
Keith E. Broyles
Mark A. McCarty
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309
patrick.flinn@alston.com
john.haynes@alston.com
keith.broyles@alston.com
mark.mccarty@alston.com

Alan L. Whitehurst
The Atlantic Building
950 F Street, NW
Washington, DC  20004-1404
alan.whitehurst@alston.com

*/s/ Richard L. Horwitz*
Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

941557/35035