IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOKIA CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-791 (GMS) |
| | ) | |
| APPLE INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Nokia Corporation ("Nokia"), on personal knowledge as to its own acts, and on information and belief as to all others based on its investigation, files this First Amended Complaint against Apple Inc. ("Apple") and alleges as follows:

### INTRODUCTION

1.      This is an action brought by Nokia against Apple for Apple's infringement of Nokia's essential and implementation patents and Apple's repudiation and/or rejection of its rights under certain undertakings Nokia made to certain standards-setting organizations ("SSO").

2.      Nokia seeks remedies for Apple's infringement of Nokia's U.S. Patent Nos. 5,802,465 ("the 465 Patent"), 5,862,178 ("the 178 Patent"), 5,946,651 ("the 651 Patent"), 6,359,904 ("the 904 Patent"), 6,694,135 ("the 135 Patent"), 6,775,548 ("the 548 Patent"), 6,882,727 ("the 727 Patent"), 7,009,940 ("the 940 Patent"), 7,092,672 ("the 672 Patent"), and 7,403,621 ("the 621 Patent") (collectively, "the Essential Patents-in-Suit").

3.      Each of the Essential Patents-in-Suit is essential to one or more of the following standards: the Global System for Mobile Communications ("GSM") Standard, the Universal Mobile Telecommunications System ("UMTS") Standard, or both, and the Institute of Electrical and Electronic Engineers ("IEEE") 802.11 Standard.

4.      Nokia has declared each of the Essential Patents-in-Suit as essential to the GSM, UMTS, and/or 802.11 Standards, where applicable, and undertaken – in accordance with the applicable rules of the applicable SSO – to grant licenses under each of the Essential Patents-in-Suit on fair, reasonable, and nondiscriminatory ("FRAND") terms and conditions (in some cases, alternatively referred to as "reasonable and non-discriminatory," or "RAND," terms).

5.      On the basis of Nokia's licensing commitments, Apple has the right to be granted license(s) under F/RAND terms and conditions with respect to a Standard.

6.      Nokia has complied with its obligations under the F/RAND commitments with respect to Apple (who is claiming the benefit thereof). For example, prior to filing this Complaint, Nokia made various offers to Apple for the F/RAND terms and conditions of a license agreement under which each of the Essential Patents-in-Suit could be licensed either individually or together with other Nokia essential patents (i.e., a portfolio license). Nokia made these offers in good faith.

7.      In its offers to Apple, Nokia has specified both a portfolio rate for a portfolio of essential patents that includes the Essential Patents-in-Suit and an average per-patent royalty rate which Apple could have accepted within a reasonable time for each of the Essential Patents-in-Suit.

8.      In its discussions with Apple, Nokia has, on more than one occasion, offered Apple terms and conditions that would not require Apple to grant Nokia a license to any Apple patents other than patents that are essential to the GSM or UMTS standards.

9.      Apple has rejected Nokia's offers for F/RAND terms and conditions both on a portfolio and on a per patent basis. Over the course of the last three years, Apple has not, among other things:

i.   Accepted Nokia's FRAND offers;

ii.   Paid Nokia any compensation for Apple's use of the Essential Patents-in-Suit;

iii.   Offered to pay Nokia F/RAND compensation for Apple's use of the Essential Patents-In-Suit;

iv.   Paid into escrow what Apple believes in good faith to be a F/RAND royalty for Apple's use of the Essential Patents-in-Suit;

v.   Committed to pay F/RAND compensation for Apple's use of the Essential Patents-in-Suit (even subject to infringement, validity, and enforceability of the Essential Patents-in-Suit being reviewed by this Court); or

vi.   Agreed to be bound by and pay any F/RAND royalty determination for Apple's use of the Essential Patents-In-Suit (even subject to infringement, validity and enforceability of the Essential Patents-In-Suit being reviewed by this Court).

10.   Apple may not claim the benefit of Nokia's F/RAND commitment while simultaneously refusing to undertake any of the corresponding obligations.  Where, as here, the facts are such that a party, among other things, refuses to accept or make a F/RAND offer, refuses to participate in the negotiation process in good faith, refuses to pay royalties it deems in good faith to be F/RAND (into escrow or directly to the patentee), and refuses to even concede that it has a payment obligation with respect to valid and infringed patents that are subject to F/RAND undertakings (even where the obligation would be conditioned upon a judicial review of the patents' validity and essentiality), that party can be characterized as an unwilling licensee and has in those circumstances repudiation and/or rejection the benefits of the patent-holders F/RAND undertakings.

11.   Nokia seeks in this action a declaration (i) that the Essential Patents-in-Suit are infringed by Apple's products complying with the respective Standards and that the Essential Patents-in-Suit are not invalid or unenforceable; (ii) that Nokia has complied with its obligations

under the F/RAND undertakings by negotiating in good faith and offering and specifying

F/RAND terms and conditions for the Essential Patents-in-Suit; (iii) that Apple has refused to

compensate Nokia on F/RAND terms for Apple's use of the Essential Patents-in-Suit and has

otherwise repudiated and/or rejected its F/RAND rights based on its conduct; and (iv) that Nokia

is entitled to an injunction for Apple's infringement of the Essential Patents-in-Suit and damages

for such infringement.

  12. Alternatively, if the Court concludes that Apple has not acted as an unwilling

licensee, Nokia seeks an injunction until and unless Apple pays F/RAND compensation, together

with interest, for past infringement of the Essential Patents-in-Suit and irrevocably commits to

pay such compensation in the future.

  13. Nokia also seeks remedies for Apple's infringement of Nokia's U.S. Patent Nos.

5,731,772 ("the 772 Patent"), 7,123,878 ("the 878 Patent"), and 6,452,402 ("the 402 Patent")

(collectively, "the Implementation Patents-in-Suit") (the Essential Patents-in-Suit and the

Implementation Patents-in-Suit are collectively referred to as "the Nokia Patents-in-Suit"). The

Implementation Patents-in-Suit are not essential to any relevant wireless communication

standards and, therefore, do not implicate licensing obligations required by membership in many

wireless communication SSOs. Nokia's implementation patents – including the Implementation

Patents-in-Suit – are particularly important to Nokia's success because they permit Nokia to

differentiate its products from those of its competitors.

  14. Apple's wireless communication devices take advantage of the decades of

continued investments by Nokia to advance cellular communications and to distinguish Nokia's

handsets from those offered by its competitors. Apple's unauthorized use of Nokia's technology

has damaged Nokia's competitive advantage in the marketplace, resulting in irreparable harm to Nokia's business reputation and market share.

## PARTIES

15.     Plaintiff Nokia is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland.

16.     Nokia was founded in 1865 and is the world's largest manufacturer of mobile telephones.  Nokia is one of the champions of wireless cellular communications and has received numerous awards and accolades for its achievements, including introducing the first car phone on the first international cellular mobile network in 1981.

17.     Nokia's innovations continue today.  In 1991, the world's first genuine call on GSM was made with a Nokia phone.  In 1996, Nokia introduced the Nokia 9000 Communicator, which was the first all-in-one phone, fax, calendar, e-mail and Internet device in a hand-portable size.  The Nokia 8110i, introduced in 1997, was the first mobile phone with a dynamic menu supporting Smart Messaging.  Just two years later, Nokia introduced the Nokia 7110, which was the first mobile phone compliant with the Wireless Application Protocol 1.1, which provided access to mobile Internet services, such as banking, e-mail, and news, as well as the first phone with predictive text input.

18.     In 2001, Nokia made the world's first 3G WCDMA voice call on a commercial system, and launched its first imaging phone with an integrated camera, the Nokia 7650.  In 2002, Nokia introduced the world's first UMTS/GSM dual mode phone, and the first Nokia phone to record video simultaneously with sound.  The Nokia 5140, launched in 2003, was the first Push-to-Talk GSM handset.  In 2006, Nokia introduced the N95, which was the first Nokia phone with built-in GPS.

19.     Research is one of the keys to Nokia's success.  As of December 2008, Nokia had research and development presence in 16 countries and employed over 39,000 people in research and development.  Such research and development led to the innovations found in the Nokia Patents-in-Suit.

20.     In the 1980s, Nokia led the charge to establish the communications protocols that are still used today.  Without Nokia's contributions and innovation, the world would not have the communications standards that it has today.  Nokia continues to be a leader in mobile communications worldwide and continues to invest millions of dollars annually in new developments in mobile communications.

21.     Upon information and belief, Defendant Apple is a corporation duly organized and existing under the laws of the state of California and has a principal place of business at 1 Infinite Loop, Cupertino, California 95014.

22.     Upon information and belief, Apple did not make telephones, much less mobile telephones, until 2007.  Apple's lack of experience in the wireless area was recently demonstrated at the 2010 Apple Worldwide Developers' Conference during the keynote address by Apple's CEO, Steve Jobs.  In demonstrating the latest version iPhone, Apple was unable to establish a wireless connection to the Internet on its flagship handset.

23.     When Apple's wireless communication devices work, they take advantage of the decades of continued investments by Nokia to build today's communication protocols and advance cellular communications.  By refusing to compensate Nokia for its patented technologies, Apple is attempting to get a "free-ride" on the billions of dollars that Nokia has invested in research and development to provide the public with the wireless communications it enjoys today.

## JURISDICTION AND VENUE

24.     This is an action arising under the patent laws of the United States.  Accordingly,

this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  The Court

has jurisdiction over Nokia's declaratory judgment claim pursuant to 28 U.S.C. §§ 2201 and

2202.

25.     This Court has personal jurisdiction over Apple because Apple has established

minimum contacts with the forum.  Apple manufactures (directly or indirectly through third

party manufacturers)and/or assembles products that are and have been used, offered for sale,

sold, and purchased in Delaware.  Apple, directly and/or through its distribution network, places

wireless communication devices within the stream of commerce, which stream is directed at this

district, with the knowledge and/or understanding that such products will be sold in the State of

Delaware.  Therefore, the exercise of jurisdiction over Apple would not offend traditional

notions of fair play and substantial justice.

26.     Apple does business in this district, including providing products that are used,

offered for sale, sold, and have been purchased in Delaware.  Venue is proper in this district

pursuant to 28 U.S.C. §§ 1391(b), (c), (d) and 1400(b).

## FACTUAL BACKGROUND

### The Mobile Wireless Industry

27.     The wireless devices developed and marketed by Nokia and Apple connect to a

variety of wireless networks, including the networks of wireless carriers, to provide

telecommunications service.  Carriers operate wireless systems that enable users to place and

receive telephone calls, send and receive e-mails, and connect to the internet through wireless

devices.  Leading carriers in the United States include AT&T (formerly Cingular), T-Mobile

USA, Verizon Wireless, and Sprint.

28.     Companies around the world manufacture wireless devices. These manufacturers typically sell their phones to the mobile wireless carriers, which in turn sell the phones to users. Wireless devices contain, among other components, one or more computer chipsets that enable the phone to communicate with the carriers' wireless systems. Carriers, device manufacturers, and chipset manufacturers must create equipment and devices compatible with each other by using common mobile wireless technology. Since carriers, device manufacturers, and chipset manufacturers must create equipment and devices compatible with each other to provide mobile wireless services, developers and manufacturers participate in the crucial process of standards development.

29.     The progression from cell phones, which primarily focus on voice communications, to smart phones required more advanced mobile wireless technologies for communications involving transmission of data such as e-mail. Since the mass market introduction of the cell phone in the 1980s, mobile wireless technology has evolved to keep pace with the rising volume of voice traffic as well as to incorporate the data transmission capabilities necessary to support increasingly sophisticated phones and other handheld devices. The technology has evolved in what are commonly referred to as "generations" of mobile wireless technology.

30.     The first generation of mobile wireless technology (1G) consisted of analog devices and networks that carried only voice traffic. The second generation of mobile wireless technology (2G) began the transition to digital devices and networks providing more efficient use of available spectrum for voice traffic and limited support for data-intensive applications such as paging and text messaging. The emergence of 2G technologies coincided with the growing commercial use of the Internet. The greater data capacity of advanced 2G networks

allowed for the development of the first smart phones, which offered new capabilities such as

taking and transmitting photographs, sending and receiving email, and limited web browsing.

Third generation (3G) wireless technology supports more advanced data intensive services, such

as multimedia, web browsing, music and video downloads, e-commerce, and position location.

Fourth Generation (4G) wireless technology is currently being developed. 4G technologies will

provide voice, data, and streamed media at much higher data rates compared to the previous

generations. Almost all wireless carriers currently support and provide 2G technology, and most

have also introduced 3G networks and services. Some carriers have announced plans for

migration to 4G networks and services in the coming years.

## The Importance of Standards

31.     The UMTS and GSM standards, as well as other mobile radio standards, were

developed under the patronage of the European Telecommunications Standards Institute

("ETSI"). ETSI is a non-profit institution that was founded in 1988 through an initiative of the

European Commission by several companies active in mobile communications with the objective

to develop a common mobile radio standard for Europe. Since it was founded, ETSI has grown

to include approximately 700 members from 56 countries. Among these members are virtually

every company active in the mobile radio sector, who together account for a substantial share of

the supply of mobile telecommunications equipment and services. Nokia and Apple are both

members of ETSI.

32.     ETSI brings important market participants in the mobile radio sector together.

Within the context of ETSI, the members develop technical standards, which often lead to a

factually binding industry standard. In some cases, national or international regulatory bodies

require adherence to particular ETSI standards.

33.     Many ETSI members, including Nokia, are engaged in research and development of new telecommunications technologies, and own intellectual property rights relating to different elements of such technologies.  Accordingly, when ETSI adopts technical standards, it must take into account that many elements of the standards are likely to be covered by such intellectual property rights.  Therefore, others wishing to exploit the standard may need licenses for the essential intellectual property rights to do so.  ETSI has therefore adopted an Intellectual Property Policy ("the ETSI IPR Policy") to govern the manner in which ETSI will take account of such intellectual property rights in the process leading to the adoption of ETSI standards.

34.     The ETSI IPR policy was adopted in 1994 and the policy has been part of the "ETSI Directives" since December 2004.  Its provisions are further explained in the ETSI Guide on Intellectual Property Rights.

35.     The objectives of the ETSI IPR Policy are defined in its Clause 3. Clause 3.1 provides as follows:

> It is ETSI's objective to create STANDARDS and TECHNICAL SPECIFICATIONS that are based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

36.     In order to achieve its objectives, the ETSI IPR Policy contains rules regarding the disclosure of essential IPR and rules regarding their licensing on FRAND terms. Members are obligated to use their reasonable endeavors to inform ETSI of essential IPRs in a timely manner, and voluntarily undertake to grant licenses on FRAND terms and conditions. Therefore,

ETSI allows its members to hold and benefit from any IPRs which they may own, including the right to refuse the granting of licenses.

37.     Clause 6.1 of the ETSI IPR Policy provides:

When an essential IPR relating to a particular standard or technical specification is brought to the attention of ETSI, the director-general of ETSI shall immediately request the owner to give within three months an irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory terms and conditions under such IPR to at least the following extent . . .

38.     The ETSI IPR Policy provides that firms owning potentially essential patents will provide undertakings of the kind envisaged by clause 6.1 of the ETSI IPR Policy preferably before adoption of the respective standard.  If an owner of an essential IPR does not submit this declaration, keeping its technology proprietary, alternatives are sought to the essential technology, which would not require the infringement of the IPR, pursuant to Clause 8.1.1 of the ETSI IPR Policy.  If no technical alternative is available, the development of the respective standards is ceased, under Clause 8.1.2 of the ETSI IPR Policy.

39.     Pursuant to the ETSI IPR Policy, Nokia has submitted declarations for certain of the Essential Patents-in-Suit.  For example, with respect to the 465 Patent, Nokia submitted a declaration stating the following;

The signatory has notified ETSI that it is the proprietor of the IPRs listed above and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.  The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licences under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain essential. ...

The construction, validity and performance of this DECLARATION shall be governed by the laws of France.

40.     Nokia has also submitted declarations with similar terms and conditions for hundreds of other Nokia patents that are essential to the GSM and UMTS standards.  In addition,

Nokia submitted a general declaration to ETSI in 1997 that Nokia was willing to license on

FRAND terms all of Nokia's patents that are essential to any ETSI standard.

    41.    Like ETSI, the Institute of Electrical and Electronics Standards Association

(IEEE-SA) is a developer of industry standards in a number of industries, including

telecommunications, information technology, nanotechnology, and information assurance.

Among the standards developed by IEEE-SA are IEEE 802.11, the standard for WLAN and

IEEE 802.16, the standard for WiMax.

    42.    Like ETSI, many IEEE-SA members, including Nokia, are engaged in the

research and development of new technologies and own intellectual property rights relating to

different elements of such technologies.  Accordingly, IEEE-SA has adopted a similar

intellectual property policy to ETSI in the IEEE-SA Standards Board Bylaws ("IEEE-SA

Bylaws").

    43.    Clause 6.2 of the IEEE-SA Bylaws states that when a standard includes the use of

Essential Patent Claims, a "letter of assurance" with regard to the essential patent may be

requested.  That letter of assurance may include:

> . . . .

> A statement that a license for a compliant implementation of the standard will be
> made available to an unrestricted number of applicants on a worldwide basis
> without compensation or under reasonable rates, with reasonable terms and
> conditions that are demonstrably free of any unfair discrimination.  At its sole
> option, the Submitter may provide with its assurance any of the following: (i) a
> not-to-exceed license fee or rate commitment, (ii) a sample license agreement, or
> (iii) one or more material licensing terms.

    44.    Clause 6.2 of the IEEE-SA Bylaws further provides for an instance where a party

providing a letter of assurance discovers additional claims that are essential to a standard:

> If, after providing a Letter of Assurance to the IEEE, the Submitter becomes
> aware of additional Patent Claim(s) not already covered by an existing Letter of
> Assurance that are owned, controlled, or licensable by the Submitter that may be

or become Essential Patent Claim(s) for the same IEEE Standard but are not the subject of an existing Letter of Assurance, then such Submitter shall submit a Letter of Assurance stating its position regarding enforcement or licensing of such Patent Claims. For the purposes of this commitment, the Submitter is deemed to be aware if any of the following individuals who are from, employed by, or otherwise represent the Submitter have personal knowledge of additional potential Essential Patent Claims, owned or controlled by the Submitter, related to a [Proposed] IEEE Standard and not already the subject of a previously submitted Letter of Assurance: (a) past or present participants in the development of the [Proposed] IEEE Standard, or (b) the individual executing the previously submitted Letter of Assurance.

45.     Clause 6.2 of the IEEE-SA Bylaws also provides that a letter of assurance, once submitted, is irrevocable.

46.     Pursuant to the IEEE-SA Bylaws, Nokia has submitted letters of assurance for certain of the Essential Patents-in-Suit.  For example, with respect to the 465 Patent, Nokia submitted a letter of assurance stating the following:

In accordance with Clause 6.2 of the *IEEE-SA Standards Board Bylaws*, the Submitter hereby declares the following: …

The Submitter may own, control or have the right to license Patent Claims that might be or become Essential Patent Claims. With respect to such Essential Patent Claims, the submitter's licensing position is as follows: …

The Submitter will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination.

### F/RAND

47.     SSOs are formed to allow wide promulgation and utilization of commonly defined standards.  These standards must be available and accessible in order to produce the intended efficiency gains and benefits and thereby for the standardization process itself to comply with competition law.  Intellectual Property Rights policies ("IPR Policies"), like those described above, provide essential IPR holders committing to license on F/RAND terms with the benefit of collecting F/RAND compensation from a far larger market than they would have

enjoyed if the protected technology had not been incorporated in the standard. Because competing proprietary technologies and systems have been abandoned in favor of a single, universal, and standardized system and set of technologies, a holder of an essential IPR can collect royalties on a large volume of standards-compliant products from a wide variety of manufacturers worldwide. In contrast, if the IPR holder's protected technology was only used in one of a number of competing systems or proprietary technologies, the patent holder could only generate returns on its R&D investments through differentiation and - if it chose to license - only collect royalties from manufacturers who chose to market and sell products for the narrow proprietary technology. This is why committing to F/RAND licensing is advantageous and rarely refused by essential IPR holders.

48.     An IPR holder that has voluntarily undertaken to license its IPRs on F/RAND terms (instead of keeping the inventions proprietary) has irrevocably committed to allow the standard to be implemented under its IPR on a F/RAND basis and thereby waived – absent exceptional circumstances - its legally defined right to exclude others from practicing the standard under its IPR. This also means that the IPR holder cannot use its hold-up power resulting from the incorporation of its technology into the standard against willing licensees and the IPR holder's right to exclude to extort royalties that do not comply with F/RAND.

49.     Once an IPR holder has made a F/RAND commitment, all manufacturers may implement the standard in their products and use the inventions from any declared essential IPRs. There is no need to wait until all the particular F/RAND terms and conditions have been negotiated with the IPR holder or until a definitive license agreement is executed setting out those terms. However, it is clear that in return for the right to practice the standard under the essential IPRs, implementing manufacturers have the obligation to pay F/RAND compensation

for the IPR used (to the extent not invalid or unenforceable). For example, according to the ETSI

IPR Policy Clause 3.2:

> IPR holders whether members of ETSI and their AFFILIATES or third parties,
> should be adequately and fairly rewarded for the use of their IPRs in the
> implementation of STANDARDS and TECHNICAL SPECIFICATIONS.

50.    Save for cases where the manufacturer refuses to take a license altogether, it

follows from F/RAND licensing commitments that the IPR holder has a duty to negotiate in

good faith and propose F/RAND terms.  Negotiations over F/RAND terms may cover the

essential IPR portfolio as a whole but, if requested, F/RAND terms should be available for each

patent separately.

51.    If the implementer refuses to take a license altogether or refuses to pay F/RAND

compensation for valid and enforceable IPRs used by it, exceptional circumstances are present

and the IPR holder may seek an injunction to prevent the implementer from continuing to

manufacture standard-compliant products without payment.

### Nokia's F/RAND Commitments and Apple's Wholesale Refusal to pay F/RAND Compensation or Negotiate in Good Faith

52.    Nokia has irrevocably undertaken the obligation to grant license(s) on F/RAND

terms and conditions to its essential patents, including the Essential Patents-in-Suit, and Apple

has the corresponding right to claim licenses on F/RAND terms on the basis of Nokia's

undertakings.

53.    The ETSI IPR Policy is, in accordance with its Article 12 governed by the laws of

France.

54.    Under French law, Nokia's undertakings made to ETSI in writing pursuant to

Article 6.1 of the ETSI IPR Policy give manufacturers a right to a license on FRAND terms and

conditions. This takes place by a "stipulation pour autrui" where the promisor (Nokia) is bound

to the stipulator (ETSI) to the benefit of third party beneficiaries (manufacturers, such as Apple).

55.     Third parties are entitled, but never obliged, to accept the benefit of a FRAND

undertaking. However, to the extent they exercise their right to a FRAND license, they also

undertake the obligation to compensate the IPR holder on a FRAND basis (to the extent the IPR

is not invalid or unenforceable) and to negotiate the license terms in good faith.  Acting in good

faith does not only mean that both sides must deal fairly with one another, but each side must

also act in a way that facilitates the counter-party's performance of its obligations.

56.     IEEE declarations create a similar mechanism where patent holders enter into

binding relationships with IEEE for the benefit of third parties, and third parties can accept the

benefit of that relationship only if they also accept the corresponding obligations.

57.     In compliance with the declarations and undertakings which Nokia submitted with

regard to its essential patents, including the Essential Patents-in-Suit, prior to filing this

complaint Nokia has negotiated in good faith over the F/RAND licensing terms with Apple.

58.     Nokia has made various offers to Apple for the F/RAND terms and conditions of

a license agreement under which Nokia's declared essential patents could be licensed either

individually or in combination with other Nokia essential patents.

59.     In its offers, Nokia has defined both a portfolio rate and an average per patent

royalty rate which Apple could have accepted within a reasonable time.

60.     Nokia has also provided Apple with information on the method used to calculate

royalties as well as claim charts assisting Apple with its technical analysis.

61.     In its discussions with Apple, Nokia has, on more than one occasion, offered Apple terms and conditions that would not require Apple to grant Nokia a license to any Apple patents other than patents that are essential to the GSM or UMTS standards.

62.     Apple claims the benefits under Nokia's F/RAND undertakings, but has wholly failed to undertake and honor the obligations attached.

63.     Apple has repeatedly rejected Nokia's offers both on a portfolio and on a per patent basis. Over the course of the last three years, Apple has not, among other things:

   i.     Accepted Nokia's offers of a F/RAND royalty rate;

   ii.    Paid Nokia F/RAND compensation;

   iii.   Offered to pay Nokia F/RAND compensation;

   iv.    Paid into escrow what Apple believes in good faith to be a F/RAND;

   v.     Committed to pay F/RAND compensation (even subject to validity and essentiality of the Essential Patents-in-Suit being reviewed, in case of a dispute, by a court);

   vi.    Agreed to be bound by and pay any F/RAND royalty determination (even when that FRAND royalty is reviewed by a court).

64.     Apple has continued this pattern of obstinacy even during the pendency of this lawsuit. At the same time that it seeks to claim the benefits of Nokia's FRAND undertakings, Apple has chosen to sit on its hands with regard to any corresponding obligations under those F/RAND undertakings.

65.     Had Apple wanted to avail itself of the benefits of the F/RAND undertaking, it could have done so. Apple could have taken any number steps to demonstrate that it was willing to abide by its obligations. What Apple cannot do is seek to enforce Nokia's F/RAND undertakings while refusing to compensate Nokia for its essential patents, including the Essential Patents-in-Suit. Apple may not have its cake and eat it too. In the present circumstances Nokia

is free from its obligations under its F/RAND undertakings and is free, in particular, to seek an injunction to halt Apple's infringement of the Essential Patents-in-Suit.

## OVERVIEW OF THE ESSENTIAL PATENTS-IN-SUIT.

66.     The Essential Patents-in-Suit are a reflection of Nokia's research and development and achievements in the world of mobile communications.  To provide a few examples, Nokia is a leader in wireless data and owns important patents in this area.  Today's wireless devices are used for a wide variety of tasks, such as sending email, browsing the Internet, and downloading applications.  These tasks all involve Nokia's advances in wireless data.  Without these advances, it would be difficult to work remotely from a coffee shop or download a new game to a phone.

67.     Nokia is also a leader in speech coding and owns important patents in this area.  In order to send audio, today's phones transmit the audio as a series of 1's and 0's.  Speech coding is the backbone of any digital wireless system.  Without speech coding, it would be difficult to talk clearly or listen to music without overwhelming the limited resources of the network.

68.     Nokia is also a leader in security and encryption and owns important patents in this area.  Today's wireless devices are frequently used for e-commerce and other purchases.  Nokia's technology allows people to use their wireless devices to conduct business without their confidential information being intercepted.

### Wireless Data Patents

69.     The 465 Patent, entitled *Data Transmission in a Radio Telephone Network*, was duly and lawfully issued on September 1, 1998.  Nokia is the current owner of all rights, title, and interest in the 465 Patent.  A true and correct copy of the 465 Patent is attached hereto as Exhibit A.

70.     The 465 Patent is essential and has been declared essential to at least the GSM, UMTS, and IEEE 802.11 standards. The 465 Patent invention allows communication over wireless networks while conserving resources on the network. It provides for the formation of a virtual data channel, such that a real data channel can be quickly established when data transmission is desired.

71.     The 904 Patent, entitled *Data Transfer in a Mobile Telephone Network*, was duly and lawfully issued on March 19, 2002. Nokia is the current owner of all rights, title, and interest in the 904 Patent. A true and correct copy of the 904 Patent is attached hereto as Exhibit B.

72.     The 904 Patent is essential and has been declared essential to at least the GSM and IEEE 802.11 standards. The 904 Patent allows for simpler communication on the networks. The invention provides that, in a radio block to be coded, user data is transferred in octet form to simplify the flow of data in the network.

73.     The 135 Patent, entitled *Measurement Report Transmission in a Telecommunications System*, was duly and lawfully issued on February 17, 2004. Nokia is the current owner of all rights, title, and interest in the 135 Patent. A true and correct copy of the 135 Patent is attached hereto as Exhibit C.

74.     The 135 Patent is essential and has been declared essential to at least the GSM standard. The 135 Patent provides an efficient method of communicating information about a mobile device operating in downlink transfer by enabling the mobile device to respond to polling codes with messages that indicate the condition of the mobile device.

75.     The 548 Patent, entitled *Access Channel for Reduced Access Delay in a Telecommunications System*, was duly and lawfully issued on August 10, 2004. Nokia is the

current owner of all rights, title, and interest in the 548 Patent. A true and correct copy of the 548 Patent is attached hereto as Exhibit D.

76.     The 548 Patent is essential and has been declared essential to at least the UMTS standard. The 548 Patent enables a mobile station to access the network with less delay. The 548 Patent invention enables access requests to be adjusted based on channel conditions, reducing overall access delays.

77.     The 672 Patent, entitled *Reporting Cell Measurement Results in a Cellular Communication System*, was duly and lawfully issued on August 15, 2006. Nokia is the current owner of all right, title, and interest in the 672 Patent. A true and correct copy of the 672 Patent is attached hereto as Exhibit E.

78.     The 672 Patent is essential and has been declared essential to at least the GSM standard. The 672 Patent enables a mobile device to report an increased number of signal quality measurements to a mobile network.

## Speech Coding Patents

79.     The 178 Patent, entitled *Method and Apparatus for Speech Transmission in a Mobile Communications System*, was duly and lawfully issued on January 19, 1999. Nokia is the current owner of all rights, title, and interest in the 178 Patent. A true and correct copy of the 178 Patent is attached hereto as Exhibit F.

80.     The 178 Patent is essential and has been declared essential to at least the GSM standard. The 178 Patent ensures clear, efficient speech communications over mobile networks. The 178 Patent invention enables multiple speech coding methods to operate at different transmission rates by using two stages of channel encoding, one of which is dependent on the speech coding method, and one of which is not dependent on the speech coding method.

81.     The 651 Patent, entitled *Speech Synthesizer Employing Post-Processing for Enhancing the Quality of the Synthesized Speech*, was duly and lawfully issued on August 31, 1999.  Nokia is the current owner of all rights, title, and interest in the 651 Patent.  A true and correct copy of the 651 Patent is attached hereto as Exhibit G.

82.     The 651 Patent is essential and has been declared essential to at least the GSM standard.  The 651 Patent ensures clear voice and audio communications over mobile networks.  The 651 Patent invention provides for a postfilter for processing speech signals derived from an excitation code book and adaptive code book of a speech decoder.

### Security and Encryption Patents

83.     The 727 Patent, entitled *Method of Ciphering Data Transmission in a Radio System*, was duly and lawfully issued on April 19, 2005.  Nokia is the current owner of all rights, title, and interest in the 727 Patent.  A true and correct copy of the 727 Patent is attached hereto as Exhibit H.

84.     The 727 Patent is essential and has been declared essential to at least the UMTS standard.  The 727 Patent ensures secure transmission of data over mobile networks.  The '727 invention prevents data from falling into the wrong hands by using a ciphering algorithm with a channel-specific parameter among its inputs.

85.     The 940 Patent, entitled *Integrity Check in a Communication System*, was duly and lawfully issued on March 7, 2006.  Nokia is the current owner of all rights, title, and interest in the 940 Patent.  A true and correct copy of the 940 Patent is attached hereto as Exhibit I.

86.     The 940 Patent is essential and has been declared essential to at least the UMTS standard.  The 940 Patent ensures secure transmission of data over mobile networks.  The 940 Patent protects communications using an integrity algorithm calculated from values including channel identity information.

87.     The 621 Patent, entitled *System for Ensuring Encrypted Communication After Handover*, was duly and lawfully issued on July 22, 2008.  Nokia is the current owner of all rights, title, and interest in the 621 Patent.  A true and correct copy of the 621 Patent is attached hereto as Exhibit J.

88.     The 621 Patent is essential and has been declared essential to at least the GSM and UMTS standards.  The 621 Patent ensures continued secure transmissions during a handover by communicating information about encryption algorithms supported by a mobile station between radio access networks.

## APPLE'S INFRINGEMENT OF THE ESSENTIAL PATENTS-IN-SUIT

89.     Upon information and belief, Apple has infringed and continues to infringe each of the Essential Patents-in-Suit by engaging in acts constituting infringement under 35 U.S.C. § 271, including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into this District and elsewhere in the United States, one or more products and services that comply with the GSM, UMTS, and/or IEEE 802.11 standards, including wireless communication devices such as the Apple iPhone, the Apple iPhone 3G, and Apple iPhone 3GS.

## HARM TO NOKIA FROM APPLE'S INFRINGEMENT OF THE ESSENTIAL PATENTS-IN-SUIT

90.     Nokia is harmed by Apple's failure to pay F/RAND compensation for its use of Nokia patented technology in a way that cannot necessarily be compensated for by a payment of a past due F/RAND royalty alone.  Apple's failure to pay a F/RAND rate for the use of the Essential Patents-in-Suit in its products at the time of their sale allows it to devote substantially more resources to research and development and lower its downstream production costs in

general. This allows it to obtain market share that it would otherwise not be able to obtain were its products to bear the costs for the patented technology.

91.     Nokia's products, in turn, must bear the costs of the development of the technology that allows them to function in compliance with the relevant standards. This puts Nokia in a competitive disadvantage to "free-riders" such as Apple.

92.     Even if Apple were to subsequently pay past due F/RAND royalties, it would still enjoy a market share it otherwise would not have but for the period of "free riding." Nokia would likewise lose its portion of the market share for the period of the "free riding." Due to the difficulty in predicting whether, if at all, such market share can be recovered, Nokia's harm cannot be compensated by payment of past due F/RAND royalties alone.

### OVERVIEW OF THE IMPLEMENTATION PATENTS-IN-SUIT.

93.     The Implementation Patents-in-Suit are a reflection of the breadth of Nokia's extensive dedication and investment in technology. The first implementation patent relates to improvements in components for transmitting wireless data. The second implementation patent allows for more efficient communications between Bluetooth enabled devices. The remaining implementation patent represents Nokia's achievements in the area of providing interconnectivity between devices.

### The 772 Patent

94.     The 772 Patent, entitled *Method and Apparatus for Compensation for a DC Voltage Offset of a Digital to Analog Converter*, was duly and lawfully issued on March 24, 1998. Nokia is the current owner of all rights, title, and interest in the 772 Patent. A true and correct copy of the 772 Patent is attached hereto as Exhibit K.

95.     The 772 Patent is directed to providing improved transmission quality by compensating for DC voltage offsets, which can cause undesirable interference in transmitted

signals. The 772 Patent allows the DC voltage compensation to adjust to changing conditions, such as temperature, without resorting to look up tables or interrupting a device's operation.

## The 878 Patent

96.     The 878 Patent, entitled *Apparatus, Method and System for a Connectivity Tool in Bluetooth Devices*, was duly and lawfully issued on October 17, 2006. Nokia is the current owner of all rights, title, and interest in the 878 Patent. A true and correct copy of the 878 Patent is attached hereto as Exhibit L.

97.     The use of short-range radio frequency communications, such as Bluetooth, has become increasingly popular in electronic devices. For example, Bluetooth technology is commonly used for communications between mobile phones and hands-free headsets and between computers and input/output devices, such as mice, keyboards, or printers. The 878 Patent simplifies the establishment of communications between Bluetooth enabled devices by providing a design wherein information about known devices is stored in a database and used to establish connections. The 878 Patent allows communications to commence between Bluetooth devices without repeated inquiries and excessive negotiations.

## The 402 Patent

98.     The 402 Patent, entitled *Apparatus for Determining the Type of External Device Being Connected*, was duly and lawfully issued on September 17, 2002. Nokia is the current owner of all rights, title, and interest in the 402 Patent. A true and correct copy of the 402 Patent is attached hereto as Exhibit M.

99.     The 402 Patent allows for improved interconnectivity between an electronic device and external devices such as a chargers, headsets, or computers. The 402 Patent describes a design that includes a connector for connecting to an external device and a processor for monitoring the connector and configuring the device to operate in accordance with the type of

external device being connected.  By dynamically configuring the device in response to the

connection, the solution of the 402 Patent saves the user time and makes the device easier to use.

### APPLE'S INFRINGEMENT OF THE IMPLEMENTATION PATENTS-IN-SUIT

100.    Upon information and belief, Apple has infringed and continues to infringe each

of the Implementation Patents-in-Suit by engaging in acts constituting infringement under 35

U.S.C. § 271, including but not necessarily limited to one or more of making, using, selling and

offering to sell, in this District and elsewhere in the United States, and importing for sale into

this District and elsewhere in the United States, one or more products and services, including

wireless communication devices such as the Apple iPhone, Apple iPhone 3G, Apple iPhone

3GS, and Apple iPad 3G.

### HARM TO NOKIA FROM APPLE'S INFRINGEMENT OF THE IMPLEMENTATION PATENTS-IN-SUIT

101.    Nokia is harmed by Apple's unauthorized use of Nokia patented technology in a

way that cannot be compensated for by a payment of damages alone.  Nokia and Apple compete

directly, with respect to at least certain Apple product offerings.  Apple's unauthorized use of the

Implementation Patents-in-Suit in its products at the time of their sale allows it to charge less for

its products because it does not have to recover the costs of development of the technology used

in the device.  This allows it to obtain market share that it would otherwise not be able to obtain

were its products to bear the costs for the patented technology. This also harms Nokia's

reputation for innovation by preventing Nokia from distinguishing its products based on the

patented technology.

102.    Nokia's products must bear the costs of the development of the technology

described in the Implementation Patents-in-Suit.  Apple's infringement prevents Nokia from

garnering the positive reputation for innovation that the Implementation Patents-in-Suit would otherwise provide. This puts Nokia in a competitive disadvantage to Apple's unauthorized use.

103.    Even when Apple is required to pay damages for past infringement, it will still enjoy a market share it otherwise would not have but for the period of unauthorized use. Nokia will likewise have lost a portion of its market share for the period of the unauthorized use. Similarly, Apple will still have benefitted from public perceptions that it properly incorporated Nokia technology in its products, and Nokia will likewise still suffer harm to its reputation for innovation. Due to the difficulty in predicting whether, if at all, such market share can be recovered, and such reputation restored, Nokia's harm cannot be compensated by payment of damages alone.

**COUNT I**
**INFRINGEMENT OF U.S. PATENT NO. 5,802,465**

104.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-103 of this Complaint as though fully set forth herein.

105.    Apple has infringed and is infringing the 465 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone, the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 465 Patent.

106.    Apple is inducing the infringement of the 465 Patent by others in the United States. The direct infringement occurs by the activities of end users of the accused products.

107.    Apple is contributing to the infringement of the 465 Patent by others in the United States. The direct infringement occurs by the activities of end users of the accused products.

108.    Apple's infringement of the 465 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

109.   Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 465 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 5,862,178

110.   Nokia incorporates by reference the allegations set forth in Paragraphs 1-109 of this Complaint as though fully set forth herein.

111.   Apple has infringed and is infringing the 178 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services that include an encoder and decoder for simultaneous bi-directional voice and/or data communications, including wireless communication devices such as the Apple iPhone, the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 178 Patent.  Nokia does not allege infringement by Apple based on the making, using, offering for sale, or selling in the United States any product that does not include an encoder and decoder for simultaneous bi-directional voice and/or data communications.

112.   Apple is inducing the infringement of the 178 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

113.   Apple is contributing to the infringement to the infringement of the 178 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

114.   Apple's infringement of the 178 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

115.   Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 178 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 5,946,651

116.   Nokia incorporates by reference the allegations set forth in Paragraphs 1-115 of this Complaint as though fully set forth herein.

117.   Apple has infringed and is infringing the 651 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services that include an encoder and decoder for simultaneous bi-directional voice and/or data communications, including wireless communication devices such as the Apple iPhone, the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 651 Patent.  Nokia does not allege infringement by Apple based on the making, using, offering for sale, or selling in the United States any product that does not include an encoder and decoder for simultaneous bi-directional voice and/or data communications.

118.   Apple is inducing the infringement of the 651 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

- 28 -

119.    Apple is contributing to the infringement to the infringement of the 651 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

120.    Apple's infringement of the 651 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

121.    Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 651 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

### COUNT IV
### INFRINGEMENT OF U.S. PATENT NO. 6,359,904

122.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-121 of this Complaint as though fully set forth herein.

123.    Apple has infringed and is infringing the 904 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone, the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 904 Patent.

124.    Apple is inducing the infringement of the 904 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

125.    Apple is contributing to the infringement to the infringement of the 904 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

126.    Apple's infringement of the 904 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

127.    Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 904 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

## COUNT V
## INFRINGEMENT OF U.S. PATENT NO. 6,694,135

128.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-127 of this Complaint as though fully set forth herein.

129.    Apple has infringed and is infringing the 135 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone, the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 135 Patent.

130.    Apple is inducing the infringement of the 135 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

131.     Apple is contributing to the infringement to the infringement of the 135 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

132.     Apple's infringement of the 135 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

133.     Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 135 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

## COUNT VI
## INFRINGEMENT OF U.S. PATENT NO. 6,775,548

134.     Nokia incorporates by reference the allegations set forth in Paragraphs 1-133 of this Complaint as though fully set forth herein.

135.     Apple has infringed and is infringing the 548 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 548 Patent.

136.     Apple is inducing the infringement of the 548 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

137.    Apple is contributing to the infringement to the infringement of the 548 Patent by others in the United States. The direct infringement occurs by the activities of end users of the accused products.

138.    Apple's infringement of the 548 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

139.    Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 548 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

## COUNT VII
## INFRINGEMENT OF U.S. PATENT NO. 6,882,727

140.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-139 of this Complaint as though fully set forth herein.

141.    Apple has infringed and is infringing the 727 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 727 Patent.

142.    Apple is inducing the infringement of the 727 Patent by others in the United States. The direct infringement occurs by the activities of end users of the accused products.

143.    Apple is contributing to the infringement to the infringement of the 727 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

144.    Apple's infringement of the 727 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

145.    Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 727 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

## COUNT VIII
## INFRINGEMENT OF U.S. PATENT NO. 7,009,940

146.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-145 of this Complaint as though fully set forth herein.

147.    Apple has infringed and is infringing the 940 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 940 Patent.

148.    Apple is inducing the infringement of the 940 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

149.    Apple is contributing to the infringement to the infringement of the 940 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

150.    Apple's infringement of the 940 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

151.    Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 940 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

## COUNT IX
## INFRINGEMENT OF U.S. PATENT NO. 7,092,672

152.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-151 of this Complaint as though fully set forth herein.

153.    Apple has infringed and is infringing the 672 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone 3G, and Apple iPhone 3GS, that infringe one or more claims of the 672 Patent.

154.    Apple is inducing the infringement of the 672 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

155.    Apple is contributing to the infringement to the infringement of the 672 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

156.    Apple's infringement of the 672 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

157.    Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 672 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

## COUNT X
## INFRINGEMENT OF U.S. PATENT NO. 7,403,621

158.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-157 of this Complaint as though fully set forth herein.

159.    Apple has infringed and is infringing the 621 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone, the Apple iPhone 3G, and Apple iPhone 3GS, that are covered by one or more claims of the 621 Patent.

160.    Apple is inducing the infringement of the 621 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

161.    Apple is contributing to the infringement to the infringement of the 621 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

162.    Apple's infringement of the 621 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

163.    Apple's acts of infringement have caused damage to Nokia and, in the event that Apple is deemed to be an unwilling licensee,  Nokia is entitled to an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the 621 Patent and such other damages and relief as may be appropriate. In the event that Apple is deemed to be a willing licensee, then Nokia is entitled to recover from Apple F/RAND compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, and such other relief as may be appropriate.

**COUNT XI**
**DECLARATORY JUDGMENT THAT APPLE HAS**
**REPUDIATED AND/OR REJECTED THE BENEFITS OF NOKIA'S F/RAND**
**COMMITMENT**

164.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-163 of this Complaint as though fully set forth herein.

165.    As a result of Nokia's declaration of its essential patents to ETSI and submission of an undertaking to grant licenses to its essential patents on F/RAND terms, Apple has the right to be granted a license under each of such patent on F/RAND basis.

166.    Nokia has met its obligations under its F/RAND undertakings through, among other things, the offers made by Nokia to Apple and negotiating in good faith.

167.    Apple has repudiated and/or rejected its rights under Nokia's F/RAND undertakings by, among other things, not:

    i.        Accepting Nokia's offers of a F/RAND royalty rate;

    ii.       Paying Nokia F/RAND compensation;

    iii.     Offering to pay Nokia F/RAND compensation;

    iv.     Paying into escrow what Apple believes in good faith to be a F/RAND;

    v.      Committing to pay F/RAND compensation (even subject to validity and essentiality of the Essential Patents-in-Suit being reviewed, in case of a dispute, by a court);

    vi.     Agreeing to be bound by and pay any F/RAND royalty determination (even when that FRAND royalty is reviewed by a court).

168.    Under the present circumstances, Apple's conduct is a repudiation and/or rejection by Apple to be bound by its obligation to compensate Nokia on F/RAND terms for its use of the Essential Patents-In-Suit.

169.    Nokia seeks a declaration that by claiming the benefit of the F/RAND commitment while refusing to undertake any of the obligations, Apple is an unwilling licensee that has based on the facts of this case repudiated and/or rejected its rights associated with Nokia's F/RAND commitments.

170.    If the Court concludes that Nokia's Essential Patents-in-Suit are infringed by Apple's products complying with the respective Standards, and that the Essential Patents-in-Suit are valid and enforceable, Nokia seeks an injunction enjoining Apple from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the Essential Patents-in-Suit.

171.    This Court's equitable powers are hereby invoked by this Count, and Nokia accordingly requests that the Court consider such other relief, equitable or otherwise, as it may find appropriate at the time for entry of judgment in this case.

## COUNT XIV
## DECLARATORY JUDGMENT REGARDING F/RAND RIGHTS

172.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-171 of this Complaint as though fully set forth herein.

173.    The Essential Patents-in-Suit are infringed, not invalid, and enforceable.

174.    Prior to filing this lawsuit, Nokia made various offers to Apple for a license to make, use, offer to sell, and/or sell products embodying the claims of the patents-in-suit, and/or the methods of the claims of the patents-in-suit.

175.    Nokia has met its obligations under its F/RAND undertakings through, among other things, the offers made by Nokia to Apple.

176.    Despite Nokia's offers for the F/RAND terms and conditions for a license under the Essential Patents-in-Suit to Apple, Apple has refused to compensate Nokia on F/RAND terms for the use of the Essential Patents-in-Suit in breach of its obligation to pay for the use of Nokia's patents.

177.    Apple's continued use of the Essential Patents-in-Suit without paying F/RAND compensation has caused and will continue to cause Nokia irreparable harm unless enjoined by the Court until Apple pays to Nokia F/RAND compensation for past infringement, and irrevocably commits to payment of such compensation in the future.

178.    Once the appropriate compensation on F/RAND terms is determined, Apple should be enjoined from importing, making, using, selling, or offering for sale products and services embodying the claimed inventions of the Essential Patents-in-Suit until and unless it pays Nokia F/RAND compensation for past infringement, and irrevocably commits to payment of such compensation in the future.

179.    This Court's equitable powers are hereby invoked by this Count, and Nokia

accordingly requests that the Court consider such other relief, equitable or otherwise, as it may

find appropriate at the time for entry of judgment in this case.

**COUNT XV**
**INFRINGEMENT OF U.S. PATENT NO. 5,731,772**

180.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-179 of

this Complaint as though fully set forth herein.

181.    Apple has infringed and is infringing the 772 Patent by making, using, offering

for sale, and selling in the United States, without authority, products and services including

wireless communication devices such as the Apple iPhone 3G, Apple iPhone 3GS, and the Apple

iPad, that infringe one or more claims of the 772 Patent.

182.    Apple is inducing the infringement of the 772 Patent by others in the United

States.  The direct infringement occurs by the activities of end users of the accused products.

183.    Apple is contributing to the infringement of the 772 Patent by others in the United

States. The direct infringement occurs by the activities of end users of the accused products.

184.    Apple's infringement of the 772 Patent is willful and deliberate, justifying an

increase of damages of up to three times under 35 U.S.C. § 284.

185.    Apple's infringement of the 772 Patent is exceptional and entitles Nokia to

attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

186.    Apple's acts of infringement have caused damage to Nokia, and Nokia is entitled

to recover from Apple compensation as a result of Apple's wrongful acts in an amount subject to

proof at trial, injunctive relief, and such other relief as may be appropriate.

## COUNT XV
### INFRINGEMENT OF U.S. PATENT NO. 7,123,878

187.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-186 of this Complaint as though fully set forth herein.

188.    Apple has infringed and is infringing the 878 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone, the Apple iPhone 3G, Apple iPhone 3GS, the Apple iPhone 4, the Apple iPad, the Apple iPod Touch, the Apple MacBook, the Apple MacBook Pro, and the Apple MacBook Air, that infringe one or more claims of the 878 Patent.

189.    Apple is inducing the infringement of the 878 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

190.    Apple is contributing to the infringement of the 878 Patent by others in the United States. The direct infringement occurs by the activities of end users of the accused products.

191.    Apple's infringement of the 878 Patent is willful and deliberate, justifying an increase of damages of up to three times under 35 U.S.C. § 284.

192.    Apple's infringement of the 878 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

193.    Apple's acts of infringement have caused damage to Nokia, and Nokia is entitled to recover from Apple compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, injunctive relief, and such other relief as may be appropriate.

## COUNT XVI
### INFRINGEMENT OF U.S. PATENT NO. 6,452,402

194.    Nokia incorporates by reference the allegations set forth in Paragraphs 1-193 of this Complaint as though fully set forth herein.

195.    Apple has infringed and is infringing the 402 Patent by making, using, offering for sale, and selling in the United States, without authority, products and services including wireless communication devices such as the Apple iPhone 3G, the Apple iPhone 3GS, and the Apple iPod Nano, that infringe one or more claims of the 402 Patent.

196.    Apple is inducing the infringement of the 402 Patent by others in the United States.  The direct infringement occurs by the activities of end users of the accused products.

197.    Apple is contributing to the infringement of the 402 Patent by others in the United States. The direct infringement occurs by the activities of end users of the accused products.

198.    Apple's infringement of the 402 Patent is willful and deliberate, justifying an increase of damages of up to three times under 35 U.S.C. § 284.

199.    Apple's infringement of the 402 Patent is exceptional and entitles Nokia to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

200.    Apple's acts of infringement have caused damage to Nokia, and Nokia is entitled to recover from Apple compensation as a result of Apple's wrongful acts in an amount subject to proof at trial, injunctive relief, and such other relief as may be appropriate.

## DEMAND FOR JURY TRIAL

201.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Nokia demands a trial by jury of this action.

## PRAYER FOR RELIEF

WHEREFORE, Nokia prays for judgment and seeks relief against Apple as follows:

(a)     For judgment that the Essential Patents-in-Suit have been and continue to be directly and/or indirectly infringed by Apple;

(b)     For judgment that the Essential Patents-in-Suit are not invalid and are enforceable;

(c)     For judgment that Apple has repudiated and/or rejected the benefit of Nokia's F/RAND commitment and thus under the present circumstances Nokia is free to seek an injunction for Apple's infringement of the Essential Patents-in-Suit.

(d)     Alternatively, for judgment that Nokia has complied with its legal obligations with respect to negotiating F/RAND terms and conditions for Nokia's Essential Patents, and that Nokia has made F/RAND offers for the Essential Patents-in-Suit.

(e)     Alternatively, for an injunction preventing further infringement, contributory infringement, and inducement of infringement of the Essential Patents-in-Suit until and unless Apple pays to Nokia such F/RAND compensation for past infringement, and irrevocably commits to payment of such compensation in the future;

(f)     For an injunction preventing further infringement, contributory infringement, and inducement of infringement of the Implementation Patents-in-Suit by Apple, including its agents, affiliates, subsidiaries, divisions, employees, servants, and others in privity with Apple;

(j)     For damages together with all interest permitted by law;

(k)     For enhanced damages to the full extent available under 35 U.S.C. § 284;

(l)     For an award of attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

(m)     For all costs of suit; and

(n)     For such other and further relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street, P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiff Nokia Corporation*

OF COUNSEL:

Patrick J. Flinn
Peter Kontio
John D. Haynes
Mark A. McCarty
Adam J. Biegel
ALSTON & BIRD LLP
1201 W. Peachtree Street
Atlanta, GA  30309-3424
(404) 881-7000

July 1, 2010
3654044

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2010, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to:

Richard L. Horwitz, Esquire
David E. Moore, Esquire
POTTER ANDERSON & CORROON LLP

I further certify that I caused to be served copies of the foregoing document on

July 1, 2010, upon the following in the manner indicated:

Richard L. Horwitz, Esquire                                    *VIA ELECTRONIC MAIL*
David E. Moore, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza – 6th Floor
1313 North Market Street
Wilmington, DE  19801

William F. Lee, Esquire                                        *VIA ELECTRONIC MAIL*
Mark D. Selwyn, Esquire
WILMERHALE
60 State Street
Boston, MA  02109

Kenneth H. Bridges, Esquire                                    *VIA ELECTRONIC MAIL*
Michael T. Pieja, Esquire
WONG, CABELLO, LUTSCH, RUTHERFORD
  & BRUCCULERI, LLP
540 Cowper Street
Palo Alto, CA  94301

Jack B. Blumenfeld (#1014)